IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TODD CIBULKA, SHELLY CIBULKA,

        Plaintiffs,

    vs.

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
UWPD OFFICERS BARRET ERWIN,
COREY JOHNSON, AND JEFF ELLIS,

CITY OF MADISON, MPD OFFICERS
HECTOR RIVERA, JOSE MARTINEZ,
HANNAH BOULDEN, TRENT SCALON,
AND JAMAR GARY,

DANE COUNTY SHERIFF'S OFFICE
(DCSO), DCSO OFFICERS MARK
ANDERSON, BRANDI ANDERSON, LUKE
DEIBELE, NATHAN KATZENMEYER,

        Defendants.

Case No. 18-CV-537

---

**DEFENDANTS CITY OF MADISON, MPD OFFICER HECTOR RIVERA, MPD OFFICER JOSE MARTINEZ, MPD OFFICERHANNAH BOULDEN, MPD OFFICER TRENT SCALON AND MPD OFFICER JAMAR GARY'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Defendants City of Madison, MPD Officer Hector Rivera, MPD Officer Jose Martinez, MPD Officer Hannah Boulden, MPD Officer Trent Scalon, and MPD Officer Jamar Gary (collectively, "City Defendants"), by their attorneys, Crivello Carlson, S.C., respectfully submit the following Brief in Support of their Motion for Summary Judgment.

## INTRODUCTION

Plaintiffs Todd and Shelly Cibulka pursue four federal civil rights claims against the City Defendants under 42 U.S.C. § 1983, all of which are dismissible at summary judgment for a number of reasons, including a lack of evidence, insufficient pleading, or the clear application of qualified immunity.  For instance, Todd Cibulka pursues a false-arrest claim in relation to his arrest for disorderly conduct and resisting, despite there being undisputed evidence supporting probable cause, such as his daughter calling the police twice requesting assistance in relation to his level of intoxication, and Todd's own concession that he actively resisted officers throughout their encounter at the scene.  Similarly, Todd pursues an excessive force claim, even though the City Defendants undisputedly only put hands and handcuffs on Todd in response to his active resistance.  Moreover, Shelly Cibulka pursues an abuse-of-process claim—the existence of which the Seventh Circuit has seriously questioned—for her temporary placement in a detoxification facility, despite an officer's undisputed testimony that she exhibited signs of intoxication and incapacitation, and her documented blood alcohol content of 0.159.  Even to the extent that Plaintiffs' individual claims take on the color of potential constitutional deprivations, the doctrine of qualified immunity decidedly stops these claims from going to a jury.  Lastly, Plaintiffs present a vague and speculative claim for municipal liability against the City of Madison for which there is simply no admissible evidence to support.  For these reasons, as outlined more fully below, the City Defendants are entitled to summary judgment.

## FACTS

All material, undisputed facts to support the City Defendants' Motion are stated and supported by citations to admissible evidence in the City Defendants' Proposed Undisputed

Facts, which is filed concurrently with their Motion, Brief, and evidentiary materials.  The City Defendants will refer to those facts throughout their Brief with citations to "CDPUF."[1]

In their operative pleading, Plaintiffs allege the following against the City Defendants under 42 U.S.C. § 1983: (1) false arrest in violation of Todd Cibulka's Fourth Amendment rights; (2) excessive force in violation of Todd Cibulka's Fourth Amendment rights; (3) federal abuse-of-process on behalf of Shelly Cibulka; and (4) municipal liability pursuant *Monell v. Dep't of Soc. Svcs. of New York City*, 436 U.S. 658 (1978).  (Am. Compl. ¶¶ 51–71, 89–96, ECF No. 3.)  As discussed below, the Court should not allow any of these claims to go to a jury because, the undisputed, material facts in the record show that the City Defendants are entitled to judgment as a matter of law.

## ARGUMENT

### I.    SUMMARY JUDGMENT IS APPROPRIATE IF THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND THE CITY DEFEDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying

---

[1] Because both plaintiffs and a central fact witness all share the same last name, the City Defendants refer to them by their first names throughout their Brief and CDPUF.

which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. Nor will speculation, hearsay, or conclusory allegations suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Mills v. First Federal Savings & Loan*, 83 F.3d 833, 840 (7th Cir. 1996). Further, "[w]hen the non-movant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict." *Lawrence v. Kenosha County*, 304 F. Supp. 2d 1083, 1087 (E.D. Wis. 2004).

Here, the undisputed facts show that the City Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims.

## II.    THE CITY DEFENDANTS DID NOT FALSELY ARREST TODD CIBULKA IN VIOLATION OF HIS FOURTH AMENDMENT RIGHTS AS A MATTER OF LAW.

### A.    Probable Cause, an Absolute Defense to False Arrest, is a Fluid Concept to Be Analyzed from the Officer's Perspective.

As defined by Wis. Stat. § 947.01, disorderly conduct is committed when a person in either a public or private place engages in violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance. *See* Wis. Stat. § 947.01(1). Under Wis. Stat. § 946.41, a person is guilty of resisting if he or she knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority. Wis. Stat. § 946.41(1).

To establish a Fourth Amendment violation based on a theory of false arrest, Todd must show: (1) there was a seizure; and (2) the seizure was unreasonable. *See* U.S. CONST. Amend. IV. The City Defendants do not dispute that Todd was "seized" in the constitutional sense when he was arrested. Thus, the sole inquiry remaining for purposes of the Fourth Amendment is whether Todd's arrest for disorderly conduct under Wis. Stat. § 947.01 and resisting an officer under Wis. Stat. § 946.41 was reasonable.

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). "[O]nce police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in hopes of uncovering potentially exculpatory evidence." *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir. 1989). Probable cause is a "fluid concept that relies on the common-sense judgment of the officers based on the totality of circumstances." *U.S. v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). It "is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." *Beauchamp v. City of Noblesville, Ind.,* 320 F.3d 733, 742–43 (7th Cir. 2003).

At the heart of the probable cause analysis is "what the police know, not whether they know the truth . . . ." *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir. 1986). Thus, in making the determination:

> [C]ourts evaluate probable cause "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the arresting officer — seeing what he [or she] saw, hearing what he [or she] heard." *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992). The test, an objective one, is whether a reasonable officer would have believed the person had committed a crime. "If so, the arrest

>       is lawful even if the belief would have been mistaken." *Id.* at
>       1057–1058.

*Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998).

Importantly, an eye witness's complaint or information is sufficient, in and of itself, to form probable cause. *See, e.g., Grimm v. Churchill*, 932 F.2d 674, 675–76 (7th Cir. 1991) (citing *Gramenos*, 797 at 439–40 ("Just as a single eyewitness's statement—without further investigation or a narration of contrary evidence—can support a warrant, so a single eyewitness's statement can support an indictment and a conviction.")). Moreover, officers are permitted to rely on law enforcement's resources in their investigation, such that "[o]bservations of fellow officers . . . engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *U.S. v. Ventresca*, 380 U.S. 102, 111 (1965); *U.S. v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) ("When law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officer under the collective knowledge doctrine."); *United States v. Nicksion*, 628 F.3d 368, 376 (7th Cir. 2010) ("Under the 'collective knowledge' doctrine, the officers who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of other officers."). Even a subsequent acquittal of the charged offense does not establish the lack of probable cause at the time of the arrest. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *Humphrey v. Staszak*, 148 F.3d 719,728 (7th Cir. 1998).

"In Wisconsin, disorderly conduct includes 'boisterous [or] unreasonably loud . . . conduct under circumstances in which the conduct tends to cause . . . a disturbance,' Wis. Stat. § 947.01(1), as well as 'defiance of a police officer's [lawful] order to move,' *see Braun v. Baldwin*, 346 F.3d 761, 765 (7th Cir. 2003)." *McCarthy v. Kezeske*, Case

No. 17-C-0986, 2018 WL 2561018, *2 (E.D. Wis. June 1, 2018). When determining whether probable cause exists, disorderly conduct does not require a showing that there was, in fact, a public disturbance; rather, disorderly conduct includes behavior that "may have" or "tended" to have provoked or aided in making a breach of peace. *See Accord Biddle v. Martin*, 992 F.2d 673, 677 (7th Cir. 1993) (arguing with a police officer could be deemed disorderly conduct depending on the circumstances and the argument's "tendency" to create public disorder); *Lester v. City of Chicago,* 830 F.2d 706, 715 (7th Cir. 1987) (finding probable cause for the plaintiff's arrest for disorderly conduct when she loudly and abusively argued with police and disrupted their normal activities).

Of course, probable cause "need not be based on evidence to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989), *cert. den'd*, 495 U.S. 931 (1990). Rather, probable cause determinations turn "on the facts as they would have appeared to a reasonable person in the position of the arresting officer -- seeing what he [or she] saw, hearing what he [or she] heard." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994) (emphasis in original) (citation and internal quotation marks omitted), *cert. den'd*, 513 U.S. 1128 (1995). This is particularly true in situations involving probable cause to arrest for disorderly conduct, because both probable cause and disorderly conduct are flexible concepts, without a fixed definition. *See Ornelas*, 517 U.S. 690, 695 (1996) (probable cause is a fluid concept that takes its substantive content from a particular context); *Lester*, 830 F.2d at 714 ("[d]isorderly conduct has never had a precise definition; the types of conduct that may be disorderly conduct 'almost defy definition'") (quoting *People v. Davis*, 413 N.E.2d 413, 415 (Ill. 1980)).

**B.     Officer Rivera had Probable Cause to Arrest Todd Cibulka for Disorderly Conduct and Resisting.**

It is undisputed that both times Emily Cibulka called the police, she informed dispatchers that her parents were intoxicated, that she could not get them into a cab, that they needed a ride, and that she did not want them to be walking along the sidewalk while they were intoxicated. (CDPUF ¶¶ 23–25, 27, 28–29, 31–33, 34.)   At the time Officer Rivera first arrived on scene, Emily was upset and crying.  *See* (CDPUF ¶¶ 44–46.)  Taking what he learned from dispatch, his interview with and impression of Emily, and his understanding that Emily's parents' behavior prompted her to call the police, a reasonable officer in Officer Rivera's position would have believed that Todd had engaged in "indecent, profrane, boisterous, unreasonably loud or otherwise disorderly conduct."  Wis. Stat. § 947.01.

Todd admits that he did not answer law enforcement's questions, gave them incorrect information about his address, and actively resisted officers throughout his time at the scene, which supports any of the City Defendants' reasonable beliefs that Todd had resisted in violation of Wis. Stat. § 946.41.  *See* (CDPUF ¶¶ 66, 78, 81.)  Further, Todd's constant, public, active resistance and willingness to physically struggle with officers to the point where a transport van was called to the scene, made his behavior not only resistant but, when coupled with the overall circumstances that brought officers to the scene, would also lead reasonable officers to believe that he was continuing to engage in disorderly conduct.  *See* (CDPUF ¶¶ 58–76, 82–92.)  *See Accord Biddle*, 992 F.2d at 677 (arguing with a police officer could be deemed disorderly conduct depending on the circumstances and the argument's "tendency" to create public disorder); *Lester,* 830 F.2d 706, 715 (7th Cir. 1987); *see also* (CDPUF ¶ 86.)

Thus, the undisputed facts show that the totality of information presented to the City Defendants at the scene on October 17, 2015, gave them the reasonable belief that Todd Cibulka had resisted them and had either committed or was continuing to commit the crime of disorderly conduct. Because the information allowed for this reasonable belief, probable cause to arrest existed as a matter law. Accordingly, the City Defendants are entitled to summary judgment as to Todd Cibulka's false arrest claim under 42 U.S.C. § 1983.

## III. THE CITY DEFENDANTS DID NOT USE EXCESSIVE FORCE IN VIOLATION OF TODD CIBUKLA'S FOURTH AMENDMENT RIGHTS AS A MATTER OF LAW.

### A. Objectively Reasonable Force Used to Effectuate the Lawful Arrest of an Actively Resisting Suspect Satisfies the Fourth Amendment.

"The Fourth Amendment's reasonableness standard governs [the Court's] evaluation of a plaintiff's claim that law-enforcement officers employed excessive force during an arrest, an investigatory stop or any other type of seizure." *Stainback v. Dixon*, 569 F.3d 767, 771 (7th Cir. 2009); *Plumhoff v. Rickard*, 572 U.S. 765, 773–74 (2014) (*citing Graham v. Connor*, 490 U.S. 386 (1989), *Tennessee v. Garner*, 471 U.S. 1 (1985)). To that end, "[t]he nature and extent of the force that may be used depends upon the circumstances surrounding the arrest, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight.'" *Stainback*, 569 F.3d at 772 (quoting *Graham*, 490 U.S. at 396). Courts must consider these factors "as they would have appeared to a reasonable officer at the scene," and, in doing so, "recognize that officers often need to make split-second judgments based on rapidly developing events." *Id.* As the *Graham* Court explained, the reasonableness analysis is one focused on "reasonableness at the moment," such that "[n]ot every push or shove, even if it may

9

later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396–97 (internal quotations and citations omitted).

As such, judges must be cautious about second-guessing a law enforcement officer's on-the-scene assessment of the danger presented by a particular situation. *Ryburn v. Huff*, 565 U.S. 469, 475–77 (2012). When an individual is resisting arrest, an officer may use the amount of force necessary to overcome his resistance. *See Stainback,* 569 F.3d at 772 ("An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest . . . ."); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592–93 (7th Cir. 1997) (holding that it was reasonable to restrain a suspect in a prone position where his violent resistance created a "need to incapacitate him and to protect the safety of the officers and other witnesses").

 "In this respect, [the Seventh Circuit's] cases indicate that an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Stainback,* 569 F.3d at 772. "However, a reasonable officer cannot be expected to accommodate an injury that is not apparent or that otherwise has not been made known . . . ." *Id.*; *see also County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017) ("Excessive force claims are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred. The inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim"); *Saucier v. Katz*, 533 U.S. 194, 204–05 (2001) ("The reasonableness of an officer's belief as to the appropriate level of force should be viewed from an on-scene perspective.").

For instance, in *Stainback*, the Seventh Circuit concluded that law enforcement officers did not violate the Fourth Amendment when they handcuffed an arrestee, Stainback, who alleged two torn rotator cuffs resulted from the use of handcuffs when Stainback was arrested for an outstanding traffic warrant and specifically asked officers not to handcuff him because he believed he would be hurt if he were handcuffed. 569 F.3d at 769, 773. Although there was no evidence that Stainback was physically resistive, aggressive, or threatening during the arrest, the Seventh Circuit reasoned that the officers did not violate the Fourth Amendment, in part, because Stainback's generalized complaints, "without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that Mr. Stainback would be injured by these actions." *Id.*

Another example with facts closer to those present here is *Williams v. Brooks*, 809 F.3d 936 (7th Cir. 2016). In that case, the Seventh Circuit upheld an officer's use of force in effectuating an arrest for resisting that arose out of what would have only been a failure-to-signal warning during a traffic stop. *Id.* at 944. The plaintiff, Williams, was pulled over for failing to signal when entering a turn lane. *Id.* at 938–41. After gathering and running Williams' information, the officer was stepping out of his squad car to deliver a warning, when Williams got out of his vehicle and started walking to the center of the gas station, where the traffic stop had occurred. *Id.* The officer commanded Williams to get back in his car several times, and Williams did not comply until the officer drew his Taser. *Id.* Williams continued to ignore multiple commands to face his vehicle in order for the officer to perform a pat-down, with the officer eventually grabbing Williams' arm and placing it behind his back to push him towards the vehicle. *Id.* Williams actively resisted by pushing back against the officer, eventually

11

turning around and refusing to comply with orders. *Id.* Another officer, after arriving on the scene, drew his Taser and forcibly placed Williams' hands behind his back to handcuff him. *Id.*

After holding that the officers had probable cause to arrest Williams for his traffic violation and forcibly resisting, the Seventh Circuit turned to the use-of-force inquiry. *Id.* at 944. The court looked at the *Graham* factors and, after noting that the initial traffic stop was only a minor offense, the court reasoned that the plaintiff's strange actions and active resistance of the pat-down posed safety risks—Williams was six feet, three inches and 195 pounds—and gave the officers probable cause to believe that the plaintiff was actively resisting arrest. *Id.* at 939, 944. From there, the Seventh Circuit concluded that the use of force—i.e., shoving the plaintiff, using handcuffs, and using other hands-on maneuvers to effectuate the arrest—was reasonable as a matter of law in light of the plaintiff's active resistance. *Id.* at 944.

**B.    The City Defendants' Minimal Use of Force to Effectuate Todd's Arrest in Light of His Continued Active Resistance was Objectively Reasonable as a Matter of Law.**

The use of force against Todd Cibulka arose in circumstances far more fluid, tense, and physical than those in *Stainback* and *Williams*, and is therefore even more objectively reasonable under the circumstances. MPD officers, including Rivera, were dispatched for a wellness check based on Emily's call to the police with concerns about her parents' level of intoxication and her inability to control them. (CDPUF ¶¶ 39–42.) As explained above, based on the information learned from dispatch, the interview with the Cibulkas, and the interviews with Emily at the scene, there was enough information for a reasonable officer in Officer Rivera's position to believe that Todd had committed the crime of disorderly conduct. Thus, the initial contact

between law enforcement and Todd was in a heightened context in comparison to the traffic stop in *Williams*.

Todd's immediate and active resistance both mirrors and exceeds the behavior in *Williams*. Todd admits that he actively resisted officers from the moment officers first put hands on him when he stood up and lurched forward to the moment he was finally secured in the transport van and taken to the Dane County Jail ("DCJ"). (CDPUF ¶ 66.) In his deposition, Todd was candid about the the specific ways he actively resisted officers' efforts to communicate with him and place him in the squad car to control the situation. *See, e.g.*, (CDPUF ¶¶ 64, 69, 72–73, 78, 81, 90–92.) Given his size—six feet, three inches and 265 pounds—and his level of intoxication at the time of his contact with law enforcement, there were clear safety risks to the officers and Todd that were magnified by his active resistance. *See* (CDPUF ¶¶ 4, 9, 19–20.)

Importantly, just as in *Williams*, all of the uses of force alleged in this case against the City Defendants directly stem from the suspect's inexplicable, active resistance. The various tactics Todd used to "st[an]d his ground," particularly coupled with the nature of the dispatch, all gave Officer Rivera and the other officers at the scene probable cause to believe that Todd was resisting arrest. (CDPUF ¶¶ 64, 69, 72–73, 78, 81, 90–92.) Unlike the officers in *Williams*, the officers on scene in this case did not draw their Tasers; rather, they simply resorted to verbal commands, handcuffs, and hands-on techniques to stabilize and promote compliance. *See* (CDPUF ¶¶ 58–59, 61, 67–68, 71, 91.) Based on the totality of the information presented to the officers, no reasonable jury could find that the minimal force used to gain control over Todd and protect the safety of the officers responding to Emily's call violated Todd's Fourth Amendment rights. As the Seventh Circuit has stated, "[t]he police need not stand by when violence erupts

and wait for a blow to render a victim unconscious, but rather may step in to prevent serious injury and restore order." *Fitzgerald v. Santoro*, 707 F.3d 725, 731 (7th Cir. 2013) (internal quotes and citations omitted).

Accordingly, the undisputed facts the record show that the City Defendants are entitled to judgment a matter of law as to Todd Cibulka's Section 1983 claim of excessive force under the Fourth Amendment.

## IV.   SHELLY CIBULKA'S FEDERAL ABUSE-OF-PROCESS CLAIM FAILS AS A MATTER OF LAW.

Shelly Cibulka's sole claim in this case is a Section 1983 abuse-of-process claim based on her protective custody commitment under Wis. Stat. § 51.45(11).[2]  As explained below, this claim fails as a matter of law for multiple reasons.

---

[2] Wis. Stat. § 51.45(11)(b) states in full:

> A person who appears to be incapacitated by alcohol or another drug shall be placed under protective custody by a law enforcement officer. The law enforcement officer shall either bring such person to an approved public treatment facility for emergency treatment or request a designated person to bring such person to the facility for emergency treatment. If no approved public treatment facility is readily available or if, in the judgment of the law enforcement officer or designated person, the person is in need of emergency medical treatment, the law enforcement officer or designated person upon the request of the law enforcement officer shall take such person to an emergency medical facility. The law enforcement officer or designated person, in detaining such person or in taking him or her to an approved public treatment facility or emergency medical facility, is holding such person under protective custody and shall make every reasonable effort to protect the person's health and safety. In placing the person under protective custody the law enforcement officer may search such person for and seize any weapons. Placement under protective custody under this subsection is not an arrest. No entry or other record shall be made to indicate that such person has been arrested or charged with a crime. A person brought to an approved public treatment facility under this paragraph shall be deemed to be under the protective custody of the facility upon arrival.

14

**A.** **All of the City Defendants Other than Officer Rivera are Entitled to Judgment as a Matter of Law for Lack of Personal Involvement.**

The Seventh Circuit has "long held that liability under § 1983 must be predicated upon personal responsibility." *Brownlow v. Van Natta*, 2 F. App'x 516, 518–19 (7th Cir. 2001) (citing *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996)). To that end, "the Seventh Circuit established in *Adams v. Pate*, 445 F.2d 105 (7th Cir. 1971)[,] that before liability will attach under § 1983, a plaintiff must demonstrate the defendant's direct personal involvement in the claimed deprivation of constitutional rights." *Franklin v. Israel*, 558 F. Supp. 712, 715 (W.D. Wis. 1983) (emphasis added) (citing as *see also Stringer v. Rowe*, 616 F.2d 993, 1000–01 (7th Cir. 1980)).

Here, Sergeant Gary, and Officers Martinez, Scanlon, and Boulden did not interact with or make any decisions relating to Shelly on October 17, 2015. (CDPUF ¶ 99.) Thus, the undisputed facts show that these City Defendants' personal involvement in the incidents surrounding Shelly's alleged abuse of process is insufficient as a matter of law to establish Section 1983 liability. Accordingly, Shelly's 42 U.S.C. § 1983 claims against Sergeant Gary, and Officers Martinez, Scanlon, and Boulden must be dismissed.

**B.** **Shelly Has Failed to State a Claim for Abuse of Process.**

Although Plaintiffs' Amended Complaint labels Shelly Cibulka's abuse-of-process claim as a Section 1983 claim, Plaintiffs make no attempt at citing a constitutional basis for the claim. (Am. Compl. ¶¶ 89–96, ECF No. 3.) To analyze the sufficiency of a pleading, the pleading should be construed in the light most favorable to the plaintiff, with all well pled facts of the complaint accepted as true and all reasonable inferences drawn in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). While a court should accept "the well-

pleaded facts in the complaint as true," "legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).  Importantly, the Supreme Court's decisions in *Twombly* and *Iqbal* ushered in a requirement that civil pleadings demonstrate some merit or plausibility in complaint allegations to protect defendants from having to undergo costly discovery unless a substantial case is brought against them." *United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013); *see also Twombly*, 550 U.S. at 557 (holding that a complaint must contain "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief).

The Seventh Circuit has questioned whether a free-standing abuse-of-process claim is cognizable as a constitutional tort under 42 U.S.C. § 1983.  *Hart v. Mannina*, 798 F.3d 578, 593–95 (7th Cir. 2015) ("It is not clear to us that abuse of process is cognizable as a Fourth Amendment claim."); *Mucha v. City of Milwaukee Employees Retirement System*, Case No. 14-C-0303, 2015 WL 13763778, *3–4 (E.D. Wis. Oct. 29, 2015) (citing *Hart* and noting that the "Seventh Circuit has questioned whether such a claim is cognizable under § 1983"); *see also Adams v. Rotkvich*, 325 F. App'x 450, 452 (7th Cir. 2009) ("[W]e conclude that abuse of process is not a free-standing constitutional tort if state law provides a remedy for abuse of process."); *Glickman v. Village of Morton Grove*, No. 18 CV 4931, 2019 WL 1754091, *4 n.5 (N.D. Ill. April 19, 2019) (citing *Adams*); *Dix v. Edelman Financial Services, LLC*, No. 17 CV 6561, 2018 WL 3922199, *8 (N.D. Ill. Aug. 14, 2018) (citing *Adams*).

"Abuse of process, unlike malicious prosecution, typically focuses on the actions of those prosecuting the case *after* legal process has been initiated (i.e., after probable cause has been established)." *Hart*, 798 F.3d at 593–95.  The *Hart* court questioned whether abuse of process

was cognizable under the Fourth Amendment, explaining that it was an "awkward fit" under that amendment because (1) Fourth Amendment protections "drop out of the picture after the detainee has received legal process, typically in an arraignment," and (2) abuse-of-process claims require proof of an "ulterior purpose," while law enforcement's subjective motivations are not usually scrutinized under the Fourth Amendment. *Id.* While the *Hart* court noted that other circuits appear to have recognized a federal abuse-of-process constitutional tort, it did not address its prior statement in *Adams*, where it specifically concluded "that abuse of process is not a free-standing constitutional tort if state law provides a remedy for abuse of process." 325 F. App'x at 452.

Plaintiffs did not even attempt to allege a constitutional basis for their abuse-of-process claim. Because this circuit has not recognized a constitutional basis for abuse-of-process claims under 42 U.S.C. § 1983 and because Plaintiffs' Amended Complaint fails to allege how such a claim is cognizable, the Court should dismiss Shelly's abuse-of-process claim as insufficiently pled.

### C.    Even if Shelly Has Stated a Section 1983 Claim for Abuse of Process, that Claim Fails as a Matter of Law.

Even assuming an abuse-of-process claim is cognizable under Section 1983, federal courts look to state law to define the parameters for such a claim. *Hart*, 798 F.3d at 593–95. Wisconsin abuse-of-process claims comprise of two elements: (1) "a willful act in the use of process not proper in the regular conduct of the proceedings"; and (2) a "misuse of the process." *Schmit v. Klumpyan*, 2003 WI App 107, ¶¶ 7–8, 264 Wis. 2d 414, 663 N.W.2d 331.

The first element requires evidence of "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process . . . and there is no

liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* ¶ 7 (internal quotations omitted).  In other words, "[t]he existence of an improper purpose alone is not enough, for this improper purpose must also culminate in an actual misuse of the process to obtain some ulterior advantage." *Id.*

The second element requires evidence "of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, . . . of use of the process to effect an object not within the scope of the process, or of any other improper purpose." *Id.* ¶ 8 (internal quotations and citations omitted).  More basically, the Wisconsin Court of Appeals has described what constitutes "process" in the abuse-of-process context:

> In its broadest sense, the term "process" comprehends all the acts *of the court* from the beginning of a proceeding to its end; in its narrower sense, it is the means of compelling the defendant to appear in court after the suing out of the original writ in a civil case and after indictment in a criminal case.

*Id.* ¶ 6 n.2 (quoting *Wells v. Waukesha County Marine Bank,* 135 Wis. 2d 519, 536–37, 401 N.W.2d 18 (Ct. App. 1986)).

Here, there is insufficient evidence to satisfy any of the elements of Shelly's abuse-of-process claim.  At the outset, a law enforcement officer's initiation of a temporary, protective custody commitment under Wis. Stat. § 51.45(11) is not a "process" as that term is used *Schmit* because it does not involve a legal process that takes place after the time of filing a civil lawsuit or after an indictment in a criminal case.  *Id.* ¶ 6 n.2.  For this reason alone, Shelly's abuse-of-process claim fails as a matter of law.

Further, there is no evidence that Officer Rivera had an ulterior motive or took some directed act not contemplated by the process under Wis. Stat. § 51.45(11).  Officer Rivera's

express goal when dealing with the Cibulkas was getting "everybody settled down and somewhere safe." (CDPUF ¶ 50.) To achieve that goal, he observed that Shelly did not have an understanding of her location or the location of her vehicle, her speech was slurred, she had an odor of alcohol, her eyes were bloodshot and glassy, she was unsteady on her feet, and Emily—by calling the police—had already exhibited an inability to control or care for Shelly. (CDPUF ¶¶ 43, 93, 95, 112.) Based on these observations, it is undisputed that Shelly appeared to Officer Rivera to be incapacitated by alcohol and, as Wis. Stat. § 51.45(11) requires, Officer Rivera took her to an approved public treatment facility, where her blood alcohol content was documented as 0.159, almost twice the legal driving limit in Wisconsin.[3] (CDPUF ¶¶ 95, 97.) Nothing in this set of facts shows an ulterior motive or achievement of some goal not contemplated by Wis. Stat. § 51.45(11).

Thus, because the undisputed evidence in this case shows that Shelly Cibulka appeared to be incapacitated by alcohol to Officer Rivera, and because there is no evidence that Officer Rivera had some ulterior motive or somehow took actions beyond the process contemplated under Wis. Stat. § 51.45(11), Shelly's abuse-of-process claim fails as a matter of law. Accordingly, summary judgment is appropriate.

## V. THE CITY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

### A. Qualified Immunity Shields Officers Against Section 1983 Liability Even in Instances Where Officers are Reasonably Mistaken.

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged

---

[3] Wis. Stat. §§ 340.01(46m), 346.63(1)(b), prohibit operating a motor vehicle with a blood alcohol concentration of 0.08 or more.

conduct.'" *City and County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff*, 572 U.S. at 778–79).   A prior case exactly on point is not necessarily required.   *See, e.g., Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).   However, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his or her] shoes would have understood that he [or she] was violating it.'" *Sheehan*, 135 S. Ct. at 1774 (quoting *Ashcroft*, 563 U.S. at 739–40).   In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added).   "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Sheehan*, 135 S. Ct. at 1774 (quoting *Ashcroft*, 563 U.S. at 743).

The plaintiff always bears the burden of establishing the existence of a clearly established constitutional right violated by the public official.  *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015); *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996).   "When reasonable minds could differ, in the typical summary judgment decision the balance tips in favor of the nonmovant while in the qualified immunity context the balance favors the movant." *Ellis v. Wynalda*, 999 F.2d 243, 246 n.2 (7th Cir. 1993).

In *Sheehan*, the Supreme Court criticized the Ninth Circuit for misreading prior Supreme Court precedent regarding qualified immunity.   Specifically, the Court criticized the Ninth Circuit for defining the right in question—there, the Fourth Amendment right to be free from unreasonable searches and seizures—at too high a level of generality:

> [N]othing in our cases suggests the constitutional rule applied by the Ninth Circuit. The Ninth Circuit focused on *Graham v. Conner*, but *Graham* holds only that the "objective reasonableness" test applies to excessive-force claims under the Fourth Amendment. That is far too general a proposition to control this case. "We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." Qualified immunity is no immunity at all if "clearly established" law can simply be defined as the right to be free from unreasonable searches and seizures.

135 S. Ct. at 1775–76 (internal citations omitted). The Supreme Court repeated this admonition to lower courts again in 2015. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). As the Court framed the issue in *Mullenix*:

> The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

136 S. Ct. at 308 (internal quotations and citations omitted) (emphasis in original).

Even if the contours of the federal right in question are found to have been clearly delineated at the relevant time, a public official may still enjoy qualified immunity if it was objectively reasonable for the official to believe that his or her actions did not violate a federal right. In fact, public officials are shielded from suit even where officials "of reasonable competence could disagree" that such acts were objectively reasonable. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In other words, "if officers of reasonable competence could disagree . . . immunity should be recognized." *Id.*

As relevant here, the officers are entitled to qualified immunity under 42 U.S.C. § 1983 unless the unlawfulness of their conduct was "clearly established at the time." *Reichle v.*

21

*Howards*, 566 U.S. 658, 664 (2012).  To be clearly established, a legal principle must be "settled law," and it must clearly prohibit the officers' conduct in the particular circumstances before them.  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991); *Saucier*, 533 U.S. at 202.  In the Fourth Amendment context, "a body of relevant case law" is necessary to "'clearly establish' the answer" with respect to probable cause.  *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *see also D.C. v. Wesby*, 138 S. Ct. 577, 581 (2018).  Notably, in the context of an alleged wrongful arrest, this Circuit considers whether the arresting officer had "arguable probable cause."  That is, even assuming that actual probable cause did not exist at the time of an arrest, officers are protected by qualified immunity because they acted with a reasonable belief as to the existence of probable cause.  *See Fleming v. Livingston County, Ill.*, 674 F.3d 874, 879–80 (7th Cir. 2012); *Gibbs v. Lomas*, 755 F.3d 529, 540 (7th Cir. 2014).

"[A] defendant is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, a reasonable officer could have mistakenly believed that probable cause existed."  *Fleming*, 674 F.3d at 880 (internal quotes omitted).  This is often termed "arguable probable cause," and although it is similar to the probable-cause analysis, it acts as an additional layer of protection from § 1983 liability for officers.  *See id.*; *Gibbs*, 755 F.3d at 540; *see also, e.g.*, *Forman v. Richmond Police Department*, 104 F.3d 950, 960–61 (7th Cir. 1997) (holding that an officer was insulated from liability even where the prosecutor later determined that there was not probable cause for the arrest and dropped the charges); *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 622–23 (7th Cir. 2010) ("To form a belief of probable cause, an arresting officer is not required . . . to act as a judge and jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute.").

"Arguable probable cause is established when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Fleming*, 674 F.3d at 879–80; *see also Lowrance v. Pflueger*, 878 F.2d 1014, 1017 (7th Cir. 1989) ("In a § 1983 action based upon a violation of the fourth amendment, it is not sufficient to establish that an arrest warrant was 'defective' . . . or that an arrest was made without probable cause."); *Spiegel v. Cortese,* 196 F.3d 717, 723 (7th Cir. 2000) ("[T]he reviewing court will ask whether an official 'acted reasonably under the settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed several years after the fact.'"); *Humphrey,* 148 F.3d at 725 (holding that arguable probable cause exists when a reasonable officer "in the same circumstances and . . . possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law."). Therefore, the test is an objective one. *Fleming*, 674 F.3d at 877.

In *Fleming*, for instance, the Seventh Circuit held that an officer was entitled to qualified immunity where he arrested a man that appeared to match the description of a sexual assault suspect, even though there were discrepancies in the officer's testimony. 674 F.3d at 881. Specifically, the plaintiff in *Fleming* argued that the officer fabricated probable cause based on indications that his testimony regarding the time between interviewing witnesses and spotting the suspect was questionable. *Id.* Noting that there was no evidence that the officer recklessly or deliberately falsified evidence, the Court held that even if the officer had fabricated evidence, the falsification must have been "material" to the finding of probable cause. *Id.*

23

**B.     The City Defendants are Entitled to Qualified Immunity.**

The City Defendants are entitled to qualified immunity as to Todd Cibulka's false arrest claim.  A reasonable officer in Officer Rivera's position—dispatched to a scene and interviewing a visibly upset student-witness who made two calls to the police regarding her intoxicated parents' refusal to cooperate with her near a busy public street—could have reasonably believed that Todd had committed disorderly conduct.  *See* (CDPUF ¶¶ 29, 32, 39–46, 86.)  The more Officer Rivera spoke to Emily and her parents—observing for himself how Todd and Shelly were intoxicated and would not answer basic questions about the location of their vehicle, and hearing firsthand Emily voice her concern that her parents were going to drive their vehicle home—Officer Rivera's belief that Todd had engaged in disorderly conduct was even more reasonable.  *See* (CDPUF ¶¶ 43, 48, 50, 52–55.)

When Todd stood up, stumbled, and began what would become a long night of actively resisting law enforcement officers' efforts to secure him, all of the City Defendants present at the scene were at that point first-hand observers of Todd's resistance, the length and degree of which required a police response so significant in such a busy, public place, that probable cause to arrest for disorderly conduct renewed with the intensifying circumstances.  *See* (CDPUF ¶¶ 58–61, 66.)  Indeed, Todd's resistance and verbal combativeness with officers eventually led to the need for a transport van, highlighting how his interactions with officers compounded probable cause for disorderly conduct that existed when officers first arrived on scene.  *See* (CDPUF ¶¶ 87, 89.)  Thus, based on the information from dispatch, the interviews with Emily, firsthand observations of Todd, and the rapidly escalating and publicly resistive behavior exhibited on

24

scene, reasonable officers in the City Defendants' positions would have believed that there existed probable cause to arrest Todd for disorderly conduct and resisting.

Further, when any one of the City Defendant officers was in close physical proximity to Todd—intoxicated, unsteady on his feet—reasonable officers in their positions would have believed they could use hands-on force and handcuffs in order to protect themselves and their fellow officers from Todd's active resistance. *See* (CDPUF ¶¶ 64, 69, 72–73, 78, 81, 90–92.) Reasonable officers facing Todd's active, physical resistance would also have believed it within the ambit of the Constitution to use hands-on force and handcuffs to protect themselves and their fellow officers, especially in light of cases like *Stainback* and *Williams*. Thus, the City Defendants are entitled to qualified immunity as to Todd Cibulka's excessive force claim.

Similarly, Officer Rivera's firsthand observations of Shelly Cibulka could have led a reasonable officer in his position to believe that Shelly appeared incapacitated by alcohol such that she should be placed in temporary, protective custody—particularly in light of her husband's arrest, her daughter's demonstrated inability to care for her, and her admitted lack of familiarity with her surroundings. (CDPUF ¶¶ 95–97.) More importantly, in light of the Seventh Circuit's hesitation to recognize the existence of an abuse-of-process claim under 42 U.S.C. § 1983, *Hart*, 798 F.3d at 593–95, it was not clearly established in October 2015 that a law enforcement officer, under any circumstances, could commit abuse of process by placing someone in temporary protective custody pursuant Wis. Stat. § 51.45. Indeed, Wis. Stat. § 51.45(11)(g) immunizes law enforcement officers from civil suit in relation to their transport of someone under Wis. Stat. § 51.45(11)(b), adding another layer of uncertainty. This alone entitles Officer

Rivera to qualified immunity as to Shelly Cibulka's abuse-of-process claim. *Brosseau*, 543 U.S. at 199.

For all of these reasons, the City Defendants are entitled to qualified immunity as to Plaintiffs' claims under 42 U.S.C. § 1983.

## VI.    PLAINTIFFS' *MONELL* CLAIM FAILS AS A MATTER OF LAW.

### A.    Plaintiffs' *Monell* Claim Fails as a Matter of Law Because They Cannot Establish a Constitutional Deprivation.

To maintain a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must first establish that he or she actually suffered a constitutional injury. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994); *see also Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of [an] individual police officer, the fact that the departmental regulations might have *authorized* [unconstitutional conduct] is quite beside the point.").

Such basis for dismissal is well recognized. *Tom v. Voida*, 963 F.2d 952, 962 (7th Cir. 1992) ("[B]ecause [the officer] did not violate [the plaintiff's] constitutional rights, there is no basis for liability" against the municipality.); *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 465 (7th Cir. 2007) ("Because we have determined that all of plaintiff's claims under federal law were properly dismissed, there can be no § 1983 liability for Boone County either."); *Thompson*, 33 F.3d at 859 (explaining that if individual officers did not violate plaintiff's constitutional rights, the municipality cannot be held liable on a *Monell* claim); *Abraham v. Piechowski*, 13 F. Supp. 2d 870, 880 (E.D. Wis. 1998) ("[a]ssum[ing] (with some skepticism) that a constitutional violation occurred" in order to proceed with a *Monell* analysis).

In limited circumstances, courts consider an exception where a constitutional violation <u>is</u>

26

<u>established</u> but individual liability is precluded solely on qualified immunity grounds. *See Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 306 (7th Cir. 2009) (reasoning that the *Monell* claim was not barred because a constitutional violation was established and individual defendants were dismissed solely based on qualified immunity). This limited exception does not apply here. As explained above, Plaintiffs cannot prove that their constitutional rights were violated. For this reason alone, Plaintiffs' *Monell* claim fails as a matter of law and should be dismissed with prejudice.

> **B.    Plaintiffs are Unable to Produce Evidence Showing the City was Deliberately Indifferent in Maintaining a Widespread Custom or Practice that Caused Plaintiffs' Alleged Constitutional Injuries.**

A plaintiff who seeks to impose municipal liability under Section 1983 must prove that an "official municipal policy" caused the complained-of injury. *Monell*, 436 U.S. at 691. To do so:

> a plaintiff must prove (1) the alleged deprivations were conducted pursuant to an **express policy, statement, ordinance, or regulation** that, when enforced, **caused** the constitutional deprivation; (2) the conduct was one of a **series of incidents amounting to an unconstitutional practice** so **permanent**, well-settled, and known to [the municipality] as to constitute a "custom or usage" **with force of law**; or (3) the conduct was caused by a **decision** of a **municipal policymaker** with final policymaking authority in the area in question.

*Abraham v. Piechowski*, 13 F. Supp. 2d 870, 880 (E.D. Wis. 1998) (emphasis added); *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011). Plaintiffs "must demonstrate that the 'deliberate action attributable to [the City of Madison] itself is the "moving force"' behind the deprivation of [the Cibulkas'] constitutional rights." *Johnson v. Cook County*, 526 F. App'x 692, 695 (7th Cir. 2013) (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 399 (1997) (citing

27

*Monell*, 436 U.S. at 694)). "The required level of factual specificity rises with the complexity of the claim," and courts must disregard mere recitations of "legal conclusions or elements of the cause of action . . . ." *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011)

A municipality can be found liable under Section 1983 only if the governmental body itself "subjects" a person to a deprivation of constitutional rights or "causes" a person "to be subjected" to such deprivation. *Monell*, 436 U.S. at 692. Local governments are responsible only for "their own illegal acts." *Id.* at 665–83. They cannot be held vicariously liable for the acts of their employees. *Brown*, 520 U.S. at 403.

Here, Plaintiffs do not allege that any express, written City or MPD policy caused a constitutional deprivation in this case. *See* (Am. Compl. ¶¶ 67–71, ECF No. 3.) Rather, they allege that the City maintained a custom or practice of "inadequately training, supervis[ing] and/or disciplining" police officers in a variety of contexts. (*Id.*)

While a custom or practice "may be so persistent and widespread [such that it has] the force of law," "[t]he word 'widespread' must be taken seriously." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970). To demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010).

"In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303. Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v.*

28

*Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006).  Rather, there must be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision."  *Id.*  "Flawed policies or training amounts to deliberate indifference only if 'the need for more or different [policies or] training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'"  *Rivera v. City of Madison*, 16-cv-673-bbc, 2018 WL 654477, *12–13 (W.D. Wis. Jan. 31, 2018) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

For instance, last year in *Rivera*, this Court dismissed a plaintiff's *Monell* claim where the plaintiff alleged that the City of Madison "failed to provide officers adequate training concerning investigation of domestic violence cases, consent to enter residences and use of force."  *Id.*  The Court reasoned that it was undisputed that the defendant-officers received training on use of force, arrest and domestic violence, and the plaintiff had failed to "adduce[ ] any evidence of a deficiency in the City's policies or training that could give rise to a claim for deliberate indifference."  *Id.*

Here, Plaintiffs' *Monell* allegations take similar shape to those in *Rivera*, and the undisputed evidence requires the same result.  Officer Rivera went to Blackhawk Technical College for his police academy between August 2008 and December 2008.  (CDPUF ¶ 114.) When he began working for the City of Madison, Officer Rivera completed an expedited, month-long academy geared towards already-licensed law enforcement officers, followed by six weeks of field training, where he attended calls that were new to him under the supervision of a field trainer.  (CDPUF ¶ 115.)  Officer Rivera was trained during his field training to recognize the

Case: 3:18-cv-00537-jdp    Document #: 61    Filed: 07/31/19    Page 30 of 31

differences between intoxicated persons and incapacitated persons, where an intoxicated person is simply drunk, and an incapacitated person shows an inability to care for himself or herself, such as inadequate clothing for the weather, or not knowing the day, date, time, or where they are. (CDPUF ¶ 112.) Similarly, Officer Rivera received training on Chapter 51 of the Wisconsin Statutes, and how to detect various mental health issues in the field. (CDPUF ¶ 113.) Moreover, the City of Madison Police Department Field Manual ("MPD Field Manual")— available to MPD officers in the field—succinctly addresses a variety of topics, including "check person" situations, disorderly conduct, operating a motor vehicle while intoxicated, protective custody/incapacitated subjects, and use of force. (CDPUF ¶¶ 116–17.)

In short, Plaintiffs are unable to produce any evidence showing how deliberate indifference on the part of the City led to inadequate training or a widespread custom that, in turn, led to a constitutional deprivation. Accordingly, the City of Madison is entitled to judgment as a matter of law as to Plaintiffs' *Monell* claim.

## CONCLUSION

Based on the foregoing, the City Defendants respectfully request that their Motion for Summary Judgment be granted, dismissing Todd and Shelly Cibulka's claims in their entirety, with prejudice, on the merits, and with costs.

Dated this 31st day of July, 2019.

By:  s/ Benjamin A. Sparks
  SAMUEL C. HALL, JR.
  State Bar No. 1045476
  BENJAMIN A. SPARKS
  State Bar No. 1092405
  Attorneys for Defendants
  City of Madison, MPD Officers Hector
  Rivera, Jose Martinez, Hannah Boulden,
  Trent Scalon, and Jamar Gary
  CRIVELLO CARLSON, S.C.
  710 N. Plankinton Avenue, Suite 500
  Milwaukee, WI 53203
  Phone: (414) 271-7722
  Fax: (414) 271-4438
  E-mail: shall@crivellocarlson.com
  E-mail: bsparks@crivellocarlson.com