IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TODD CIBULKA, SHELLY CIBULKA,

        Plaintiffs,

        vs.

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
UWPD OFFICERS BARRET ERWIN,
COREY JOHNSON, AND JEFF ELLIS,

CITY OF MADISON, MPD OFFICERS
HECTOR RIVERA, JOSE MARTINEZ,
HANNAH BOULDEN, TRENT SCALON,
AND JAMAR GARY,

DANE COUNTY SHERIFF'S OFFICE
(DCSO), DCSO OFFICERS MARK
ANDERSON, BRANDI ANDERSON, LUKE
DEIBELE, NATHAN KATZENMEYER,

        Defendants.

Case No. 18-CV-537

---

**DEFENDANTS CITY OF MADISON, MPD OFFICER HECTOR RIVERA, MPD
OFFICER JOSE MARTINEZ, MPD OFFICERHANNAH BOULDEN, MPD OFFICER
TRENT SCALON AND MPD OFFICER JAMAR GARY'S
REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT (ECF NO. 60)**

---

Defendants City of Madison, MPD Officer Hector Rivera, MPD Officer Jose Martinez,

MPD Officer Hannah Boulden, MPD Officer Trent Scalon, and MPD Officer Jamar Gary

(collectively, "City Defendants"), by their attorneys, Crivello Carlson, S.C., respectfully submit

the following Reply Brief in Support of Their Motion for Summary Judgment, (ECF No. 60.)

<u>**ARGUMENT**</u>

**I.** **OFFICER RIVERA[1] IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON TODD CIBULKA'S FALSE-ARREST CLAIM.**

    **A.** **Probable Cause Existed to Arrest Todd for Resisting and Disorderly Conduct.**

In asserting that certain facts disprove the existence of probable cause to arrest Todd, Plaintiffs consistently focus their discussion on select facts that occurred after officers arrived on scene. For instance, Plaintiffs argue that Todd's failure to answer questions "is not probable cause of resisting," and the officers lacked "legal basis to physically detain" Todd such that "they could not then arrest him for resisting for failing to sit down or for tensing his arms after they grabbed him." (Pls.' Br. Opp. Mot. Summ. J. at 17–18, ECF No. 62.)

However, Plaintiffs' analysis overlooks the undisputed fact that Todd's actions occurred after Emily's multiple reports of Todd's and Shelly's intoxication to dispatch, which prompted the officers' initial contact with Todd in the first place. *See* (Pls.' Resp. City Defs.' CDPUF ¶¶ 27, 31, ECF No. 84.) Thus, the questions Todd did not answer and Todd's physical altercation with officers all happened within the context of an ongoing investigation into Emily's two calls to the police reporting her parents' intoxication. Plaintiffs cannot genuinely dispute that Todd did not answer law enforcement's questions, that he gave them incorrect information about where he lived, and that he actively resisted officers throughout his time at the scene,

---

[1] Plaintiffs direct their arguments in relation to their false-arrest claim only towards Officer Rivera, showing that they have abandoned their alleged false-arrest claims against the remaining City Defendants. *Laborers' Intern. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999); *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003).

which supports any of the City Defendants' reasonable beliefs that Todd had resisted in violation of Wis. Stat. § 946.41. *See* (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 66, 77, 78, 81.)

Further, Plaintiffs do not dispute that officers felt resistive tension in Todd's body during their encounter, and that Todd used locking techniques to resist officers' efforts to place him in a squad vehicle. (Pls.' Resp. CDPUF ¶¶ 83–84, ECF No. 84.) Plaintiffs' similarly do not dispute that Todd refused to enter the transport van by locking his body and using dead weight tactics, and that leg restraints were applied to ensure officer safety. (*Id.* ¶¶ 90–91.) Thus, Plaintiffs do not dispute that, even after Todd was placed in handcuffs, he continued to resist officers' efforts.

To support their argument that there was not probable cause to arrest for disorderly conduct, Plaintiffs attempt to distinguish the Wisconsin case law cited in the City Defendants' moving Brief. (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 20–21, ECF No. 81.) Plaintiffs' then state that *Biddle Martin*, 992 F.2d 673 (7th Cir. 1993), is a case "more like the facts of this case in that it involved an encounter with officers on a public roadway, rather than inside a government building where higher standards of order and decorum apply." (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 22, ECF No. 81.)

The City Defendants agree with Plaintiffs that the *Biddle* case is instructive here. In *Biddle*, the Seventh Circuit reiterated that the probable cause question is an appropriate question of law for the court at the summary judgment stage, and held that the plaintiff's "drunken tirade created probable cause to arrest him for disorderly conduct." 992 F.2d at 676, 678. The Seventh Circuit held that officers had probable cause to arrest the plaintiff for disorderly conduct where the intoxicated plaintiff exhibited disruptive behavior by yelling at police officers and pacing along a sidewalk as the officers arranged to tow his van in which he had been a passenger while

the driver was arrested for driving under the influence. 992 F.2d at 674–75, 677. Finding that there was probable cause for arrest, the court reasoned as follows:

> [The plaintiff] was intoxicated and violently opposed to the towing of his van. He launched a ten-minute tirade against [the officer], screaming, swearing and waving his arms. He refused to calm down and continued this performance after she called for assistance. This behavior justifies a reasonable belief that his resistance to the tow might escalate once the tow truck arrived, generating a real possibility of physical confrontation between [the plaintiff] and the tow truck driver or the police officers.

*Id.* at 677–78.

Similarly, it is undisputed that Todd—who admits he was intoxicated—was "evasive with [O]fficer Rivera when asked where their vehicle was parked." (Pls.' Resp. CDPUF ¶¶ 20, 53, ECF No. 84.) Plaintiffs further do not dispute that, during Officer Rivera's second interview with Emily, he turned to observe Todd face-to-face with Officer Erwin, refusing verbal instructions to sit down. (*Id.* ¶ 57.) Todd's constant, public, active resistance, and willingness to physically struggle with officers to the point where a transport van was called to the scene, made his behavior not only resistant but, when coupled with the overall circumstances that brought officers to the scene, like in *Biddle*, would also lead reasonable officers to believe that he was continuing to engage in disorderly conduct. *See* (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 58–76, 82–92.)

"[I]f a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is *any* reasonable basis to conclude that probable cause existed." *Biddle*, 992 F.2d at 676 (internal quotes and citations omitted). "[I]n § 1983 actions for false arrest, probable cause need not have existed for the charge for

which the plaintiff was arrested, so long as probable cause existed for arrest on a closely related charge." *Id.*

The undisputed facts here show that the totality of information known to the City Defendants at the scene on October 17, 2015, gave them the reasonable belief that Todd Cibulka had resisted them and had either committed or was continuing to commit the crime of disorderly conduct. Because the available information allowed for this reasonable belief, probable cause to arrest existed as a matter law. Accordingly, the Court should grant summary judgment on Todd's false arrest claim.

### B. Officer Rivera is Entitled to Qualified Immunity.

Plaintiffs assert that arguable probable cause did not exist because "no reasonable officer ***would*** think that the facts as known by the officers at the time of the arrest constituted probable cause to believe Cibulka engaged in any crime." (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 26, ECF No. 81) (emphasis added). However, this argument misunderstands the standard for determining whether arguable probable cause exists. "Arguable probable cause is established when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question ***could have*** reasonably believed that probable cause existed in light of well-established law." *Fleming v. Livingston County, Ill.*, 674 F.3d 874, 879–80 (7th Cir. 2012) (emphasis added). Plaintiffs then incorrectly assert that Officer Rivera "created a disruption by grabbing Cibulka," despite their concession that Officer Rivera put hands on Todd only after he saw other officers engaged in a situation that appeared as though it could become a physical confrontation. (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 27, ECF No. 81); (Pls.' Resp. CDPUF ¶¶ 57, 62–63, 67, ECF No. 84.)

A reasonable officer in Officer Rivera's position—dispatched to a scene and interviewing a visibly upset student-witness who made two calls to the police regarding her intoxicated parents' refusal to cooperate with her near a busy public street—could have reasonably believed that Todd had committed disorderly conduct. *See* (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 29, 32, 39–46, 86.) The more Officer Rivera spoke to Emily and her parents—observing for himself how Todd and Shelly were intoxicated and would not answer basic questions about the location of their vehicle—Officer Rivera's belief that Todd had engaged in disorderly conduct was even more reasonable. *See* (*id.* ¶¶ 43, 48, 50, 52–55.) Todd's actions at the scene, which disrupted Officer Rivera's investigation, quickly escalated into behavior that could be considered disorderly conduct much like the plaintiff's conduct in *Biddle*. *See* (*id.* ¶ 57.) Indeed, Todd's resistance and verbal combativeness with officers eventually led to the need for a transport van, highlighting how his interactions with officers compounded probable cause for disorderly conduct that existed when officers first arrived on scene. *See* (*id.* ¶¶ 87, 89.) The officers also observed Todd's daughter telling both of her parents that the officers were trying to help Todd while he actively resisted and struggled with them on the public sidewalk. *See* (State Defs.' PFOF ¶¶ 47–52, 54–55, ECF No. 66.) Thus, based on the totality of the facts known to Officer Rivera at the time, he "***could have*** reasonably believed" that there was probable cause to arrest Todd for disorderly conduct. *Fleming*, 674 F.3d at 879–80 (emphasis added). Accordingly, Officer Rivera is entitled to qualified immunity.

## II.  THE CITY DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON TODD CIBULKA'S EXCESSIVE-FORCE CLAIM.

### A.  The Minimal Force Used on Todd at the Scene was Objectively Reasonable Under the Circumstances.

At the outset, Plaintiffs do not contend that any of the City Defendants other than Officer Rivera used excessive force at the scene, and they therefore abandon such excessive force claims against the other City Defendants.  *Laborers' Intern.*, 197 F.3d at 1197; *Palmer*, 327 F.3d at 597.

Plaintiffs do not dispute that Officer Rivera was the third officer to put hands on Todd. (Pls.' Resp. CDPUF ¶¶ 63, 67, ECF No. 84.)  Plaintiffs also do not dispute that Officer Rivera's physical contact with Todd arose after Officer Rivera heard Officer Erwin giving Todd verbal instructions to sit down and, when Officer Rivera looked over to see what was happening, he observed Todd standing up, refusing to sit down, face to face with Officer Erwin.  (*Id.* ¶ 57.)  To that end, Plaintiffs do not dispute that Officer "Rivera testified that he believed a physical encounter was possible 'just by the way [Todd] was standing and by the way the other officers were reacting . . . .'"  (*Id.* ¶ 62) (quoting Officer Rivera's testimony).  Thus, Plaintiffs' arguments relating to officers creating "physically threat[en]ing situation[s]," are misplaced, as it is undisputed that Officer Rivera's use of force on Todd arose under circumstances where he was responding to what he perceived to be a developing situation that was already escalating into a physical altercation.  *See* (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 32, ECF No. 81.)

Instead of disputing the totality of facts facing Officer Rivera at the time he put hands on Todd, Plaintiffs instead resort to their expert's unsupported opinions and use terms like "choking" and "hog-tying," without any citation to admissible evidence that any Madison Police

Officer engaged in such acts. (*Id.* at 31–32.) There is no evidence in the record showing that any Madison Police Officer used force described as "choking" or "hog-tying." Further, citing case law relating to unprovoked and gratuitous uses of force, Plaintiffs argue that the force used in taking Todd to the ground was unreasonable, alleging that he was taken to the ground "for simply standing up." (*Id.* at 22.) However, the undisputed evidence in the record—relied on both by Plaintiffs and Defendants—simply does not show that Todd stood up and was taken to the ground because he was standing, and the Court is not bound by Plaintiffs' unsupported factual assertions where the video evidence clearly contradicts such assertions. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage."); *see also Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("[W]e assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

Despite Plaintiffs' unsupported and inaccurate characterization of the events, Todd admits—and Plaintiffs cannot genuinely dispute—that he actively resisted officers from the moment officers first put hands on him to the moment he was finally secured in the transport van and taken to the Dane County Jail ("DCJ"). (City Defs.' Repl. Pls.' Resp. CDPUF ¶ 66); (City Defs.' Resp. Pls.' PFOF ¶¶ 46–47, 49, ECF No. 76.) Indeed, in his deposition, Todd was candid about the specific ways he actively resisted officers' efforts to communicate with him and place him in the squad car to control the situation—tactics that Plaintiffs do not deny were used, but that they attempt to re-brand as tactics "often used by lawful protestors in sit-ins, boycotts, blockades, and occupations of buildings." *See, e.g.*, (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 64,

69, 72–73, 78, 81–82,, 90–92.) Given his size—six feet, three inches and 265 pounds—and his level of intoxication at the time of his contact with law enforcement, there were clear safety risks to the officers and Todd that were magnified by his acts. *See* (*id.* ¶¶ 4, 9, 19–20.) Further, based on the information learned from dispatch, the interview with the Cibulkas, and the interviews with Emily at the scene, there was enough information for a reasonable officer in Officer Rivera's position to believe that Todd had committed the crime of disorderly conduct. *See* (*id.* ¶¶ 39–42.)

Importantly, in contrast to the circumstances present in *Clash v. Beatty*, 77 F.3d 1045 (7th Cir. 1996), all of the uses of force alleged in this case against the City Defendants directly stem from Todd's undisputed resistive tactics. The various tactics Todd used to "st[an]d his ground," coupled with the nature of the dispatch, all gave Officer Rivera and the other officers at the scene probable cause to believe that Todd was resisting arrest. (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 64, 69, 72–73, 78, 81, 90–92.) Unlike the circumstances in *Clash*, the officers on scene in this case resorted to verbal commands, handcuffs, and hands-on techniques to stabilize and promote compliance in light of Todd's repeated refusals to comply. *See* (*id.* ¶¶ 58–59, 61, 66–68, 71, 91.) Plaintiffs' description of how officers came to first place hands on Todd is simply unsupported by evidence (or contradicted by clear video evidence), and Plaintiffs' minimal description of Todd's active resistance during the encounter paints only a partial picture of the active resistance Todd admitted to during his deposition.

Based on the totality of the information presented to the officers, no reasonable jury could find that the minimal force used to gain control over Todd and protect the safety of the officers responding to Emily's call violated Todd's Fourth Amendment rights. As the Seventh

Circuit has stated, "[t]he police need not stand by when violence erupts and wait for a blow to render a victim unconscious, but rather may step in to prevent serious injury and restore order." *Fitzgerald v. Santoro*, 707 F.3d 725, 731 (7th Cir. 2013) (internal quotes and citations omitted).

Thus, the undisputed facts in the record show that Officer Rivera is entitled to judgment a matter of law as to Todd Cibulka's Section 1983 claim of excessive force under the Fourth Amendment. Accordingly, the Court should grant the City Defendants' Motion for Summary Judgment.

**B.    Officer Rivera is Entitled to Qualified Immunity.**

It is undisputed that, when Officer Rivera first put hands on Todd, Todd was already beginning to resist Officers Erwin and Johnson, who already had hands on Todd. *See* (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 57, 62–64.) When any one of the City-Defendant officers was in close physical proximity to Todd—intoxicated, unsteady on his feet—reasonable officers in their positions would have believed they could use hands-on force and handcuffs in order to protect themselves and their fellow officers from Todd's active resistance. *See* (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 64, 69, 72–73, 78, 81, 90–92.) Reasonable officers facing Todd's active, physical resistance would also have believed it within the ambit of the Constitution to use hands-on force and handcuffs to protect themselves and their fellow officers. A reasonable officer in Officer Rivera's position would have known that he was permitted to use hands-on force to protect himself and other officers on the scene, and to secure Todd such that the officers could complete their investigation of Emily's calls to the police.

Once the encounter became physical, Todd refused to comply with nearly every single request by the police to deescalate the situation. Officer Rivera was not required to allow Todd

to take control of the situation or impose his will in such a way that would impede the investigation. Instead, Officer Rivera came to the aid of other officers in using minimal force through trained, hands-on techniques to gain compliance and secure the scene. Plaintiffs' repeated refrain that Todd was grabbed and tackled does not change the evidence or the reasonableness of Officer Rivera's actions in light of the totality of evidence. Thus, Officer Rivera is entitled to qualified immunity as to Todd Cibulka's excessive force claim.

**C.** **The Minimal Force Used on Todd at the DCJ was Objectively Reasonable Under the Circumstances and the City Defendants are Entitled to Qualified Immunity.**

Plaintiffs argue that Officers Boulden, Martinez, and Scalon, and Sergeant Gary used excessive force when they assisted deputies with placing Todd in the restraint chair. (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 44, ECF No. 81.) However, Plaintiffs do not identify any specific uses of force employed by these City Defendants that were excessive, and Plaintiffs have not presented any evidence to show that the City Defendants did anything more than attempt to hold certain parts of Todd's body still while he was placed in the restraint chair. *See* (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 101–09.) Plaintiffs have not produced any evidence that any of the City Defendants struck Todd, employed any compliance techniques, or otherwise applied any degree of force beyond simply attempting to hold his body still. *See* (*id.*) None of the references to pressure applied to Todd's neck are directed at the City Defendants. *See* (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 46, ECF No. 81.)

Further, as it relates to the City Defendants' brief interaction with Todd at the DCJ, Plaintiffs do not dispute that Todd was resisting the attempts to place him in the restraint chair by shifting his upper torso and arms. (City Defs.' Resp. Pls.' PFOF ¶ 146, ECF No. 76.) Todd was

also tensing up his arms, and attempting to stand back up and thrus his hips forward and away from the restraint chair. (*Id.*) In light of Todd's resistance, size, and strength, and the City Defendants' very recent observations of Todd at the scene, it was objectively reasonable for the City Defendants to attempt to secure Todd's body such that he could be placed in the chair without potentially harming deputies or other officers. As Dane County's Rule 30 witness noted, it is "common sense" that non-jail officers can provide assistance with placing arrestees in the restraint chair when the circumstances call for it. (*Id.* ¶ 170.) At the very least, a reasonable officer in any of the City Defendants' positions could have believed that assisting the deputies placing Todd in the restraint chair was a objectively reasonable and necessary to ensure safety and order in the booking room, particularly in light of the undisputed, active resistance Todd displayed throughout his time at the scene.

Accordingly, the City Defendants' Motion for Summary Judgment should be granted as to the sole claims against Officers Boulden, Martinez, and Scanlon, and Sergeant Gary.

## III.    PLAINTIFFS' *MONELL* CLAIM FAILS AS A MATTER OF LAW.

To support their failure-to-train theory of *Monell* liability, Plaintiffs simply state that "[t]he facts are disputed regarding the trainings attended by the officers," citing only their response to a Proposed Fact about Officer Rivera's training in relation to incapacitated individuals. (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 55, ECF No. 81) (citing Pls.' Resp. CDPUF ¶ 112, ECF No. 84.) However, there is no dispute that Officer Rivera was trained to recognize the differences between intoxicated individuals and incapacitated persons—whether that training occurred at the Madison Police Department is immaterial.

Importantly, Plaintiffs do not dispute that Officer Rivera: went to Blackhawk Technical College for police academy, (Pls.' Resp. CDPUF ¶ 114, ECF No. 84); completed an expedited, month-long academy geared towards already-licensed law enforcement officers, followed by six weeks of field training, where he attended calls that were new to him under the supervision of a field trainer, (*id.* ¶ 115); and received training on Chapter 51 of the Wisconsin Statutes, and how to detect various mental health issues in the field, (*id.* ¶ 113.) Plaintiffs further do not dispute that the City of Madison Police Department Field Manual ("MPD Field Manual")—available to MPD officers in the field—succinctly addresses a variety of topics, including "check person" situations, disorderly conduct, operating a motor vehicle while intoxicated, protective custody/incapacitated subjects, and use of force. (*Id.* ¶¶ 116–17.) In sum, Plaintiffs have not put forth any evidence of a lack of training that caused any constitutional deprivation in this case.

Similarly, Plaintiffs have failed to produce any evidence to support their argument that "[t]he City has . . . shown deliberate indifference by its failure to adopt appropriate procedures to deal responsibly with complaints of police brutality, and evidence of their failure to make reasonable investigations of such complaints." (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 56, ECF No. 81.) To support their argument Plaintiffs' simply state, without citation to evidence, their dissatisfaction with the City's response to Todd Cibulka's citizen complaint relating to the incident. This is patently insufficient to show a widespread custom or practice amounting to deliberate indifference.

In short, Plaintiffs have not produced any evidence at all showing how deliberate indifference on the part of the City led to inadequate training or a widespread custom that, in

turn, led to a constitutional deprivation. Accordingly, the City of Madison is entitled to judgment as a matter of law as to Plaintiffs' *Monell* claim.

## IV. SHELLY CIBULKA'S ABUSE-OF-PROCESS CLAIM FAILS AS A MATTER OF LAW.

Apparently recognizing the legal pitfalls associated with Shelly's Section 1983 abuse-of-process claim, Plaintiffs pivot and, rather than arguing that Shelly's sole claim for relief is cognizable under Section 1983, they instead assert for the first time that Shelly has stated a claim for abuse of process under Wisconsin law. *See* (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 37–42, ECF No. 81); *see also* (Am. Compl. ¶¶ 89–96, ECF No. 3.) Indeed, Plaintiffs do not even attempt to counter the City Defendants' arguments relating to the insufficiency of Shelly's Section 1983 claim. For this reason alone, Shelly's sole claim is deemed abandoned and must be dismissed as a matter of law. *Laborers' Intern.*, 197 F.3d at 1197; *Palmer*, 327 F.3d at 597. Moreover, for the reasons outlined more fully below, Plaintiffs' attempt at pleading a new abuse-of-process claim fails both in procedure and substance.

### A. Plaintiffs Cannot Plead New Claims in Their Response Brief.

Plaintiffs did not plead an abuse-of-process claim under Wisconsin law and they do not ask the Court to allow them to do so now. *See* (Am. Compl. ¶¶ 89–96, ECF No. 3.) Plaintiffs seem to concede this fact, as their response to the City Defendants' Motion appears to anticipate the City Defendants' state-law defenses by arguing that Officer Rivera is not entitled to discretionary immunity under Wis. Stat. § 893.80. *See* (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 40–42, ECF No. 81.) However, "plaintiff[s] may not amend [their] complaint in [their] response brief." *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F. 3d

436, 448 (7th Cir. 2011). For this reason alone, Shelly's newly alleged state-law abuse-of-process claim must be dismissed.

### B. Even Assuming Plaintiffs Pled a State-Law Claim for Abuse of Process, the Claim Fails as Matter of Law.

Even assuming Plaintiffs pled an abuse of process claim under Wisconsin law, the claim fails as a matter of law. Wisconsin abuse-of-process claims comprise of two elements: (1) "a willful act in the use of process not proper in the regular conduct of the proceedings"; and (2) a "misuse of the process." *Schmit v. Klumpyan*, 2003 WI App 107, ¶¶ 7–8, 264 Wis. 2d 414, 663 N.W.2d 331.

The first element requires evidence of "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process . . . and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* ¶ 7 (internal quotations omitted). In other words, "[t]he existence of an improper purpose alone is not enough, for this improper purpose must also culminate in an actual misuse of the process to obtain some ulterior advantage." *Id.*

The second element requires evidence "of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, . . . of use of the process to effect an object not within the scope of the process, or of any other improper purpose." *Id.* ¶ 8 (internal quotations and citations omitted). More basically, the Wisconsin Court of Appeals has described what constitutes "process" in the abuse-of-process context:

> In its broadest sense, the term "process" comprehends all the acts *of the court* from the beginning of a proceeding to its end; in its narrower sense, it is the means of compelling the defendant to appear in court after the suing out of the original writ in a civil case and after indictment in a criminal case.

*Id.* ¶ 6 n.2 (quoting *Wells v. Waukesha County Marine Bank,* 135 Wis. 2d 519, 536–37, 401 N.W.2d 18 (Ct. App. 1986)).

As relevant here, Plaintiffs allege that Officer Rivera abused process as it relates to his decision to place Shelly in protective custody. *See* (Am. Compl. ¶¶ 41–45, ECF No. 3.) Under Wis. Stat. § 51.45, a law enforcement officer "*shall*" place "[a] person who *appears* to be incapacitated by alcohol . . . under protective custody . . . ." Wis. Stat. § 51.45(11)(b) (emphasis added). Someone appears incapacitated by alcohol if he or she appears to be "unconscious" or appears "to ha[ve] his or her judgment otherwise so impaired that he or she is incapable of making a rational decision, as evidenced objectively by such indicators as extreme physical debilitation, physical harm or threats of harm to himself or herself or to any other person, or to property." *Id.* § 51.45(2)(d). After determining that someone appears incapacitated by alcohol, the officer "shall" then "either bring such person to an approved public treatment facility for emergency treatment or request a designated person to bring such person to the facility for emergency treatment." *Id.* By holding the person in protective custody, the officer "shall make every reasonable effort to protect the person's health and safety." *Id.*

Here, the undisputed evidence shows that Officer Rivera did not abuse any process under Wis. Stat. § 51.45. In their Brief, Plaintiffs' allege, without citation to any evidence in the record, that Officer Rivera placed Shelly into temporary protective custody "for the purpose of harassing and humiliating her and restricting her movement." (Pls.' Br. Opp. City Defs' Mot. Summ. J. at 38, ECF No. 81.) However, "restricting [Shelly's] movement"[2] is not a purpose

_____

[2] Plaintiffs appear to be using language commonly associated with false imprisonment under Wisconsin law. *See, e.g.*, *Herbst v. Wuennenberg*, 83 Wis. 2d 768, 774, 266 N.W.2d 391 (1978) ("The action for the tort of false

outside the scope of Wis. Stat. § 51.45(11)—placing someone in protective *custody* presumes that their movement will be temporarily restricted for their own safety. *See* Wis. Stat. § 51.45(11)(b) ("The law enforcement officer . . . in *detaining* such person or in taking him or her to an approved public treatment facility or emergency medical facility, is *holding* such person under protective custody . . . ." (emphasis added)).

Further, Plaintiffs have not cited any evidence showing Officer Rivera's purpose in taking Shelly into protective custody was to "humiliate[e]" or "harass[ ]" her—those words do not appear in Plaintiffs' Proposed Findings of Fact—and Plaintiffs concede that Officer "Rivera believed Ms. Cibulka was incapacitated by alcohol . . . ." *See* (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 40, ECF No. 81); (City Defs.' Resp. Pls.' PFOF ¶¶ 100–11, ECF No. 76.) It is undisputed that Officer Rivera's express goal when dealing with the Cibulkas was getting "everybody settled down and somewhere safe." (City Defs.' Repl. Pls.' Resp. CDPUF ¶ 50.) To achieve that goal, he observed that Shelly did not have an understanding of her location or the location of her vehicle, her speech was slurred, she had an odor of alcohol, her eyes were bloodshot and glassy, she was unsteady on her feet, and Emily—by calling the police—had already exhibited an inability to control or care for Shelly. (*Id.* ¶¶ 43, 93, 95, 112.) Based on these observations, it is undisputed that Shelly appeared to Officer Rivera to be incapacitated by alcohol. *See* (Defs.' Resp. Pls.' PFOF ¶ 105, ECF No. 76) ("Rivera believed that Mrs. Cibulka was 'definitely'

---

imprisonment protects the personal interest in freedom from *restraint of movement*." (emphasis added)). Wis. Stat. § 51.45 bars false imprisonment claims against law enforcement officers who place persons into protective custody. *See* Wis. Stat. § 51.45(11)(g) ("Any law enforcement officer, designated person or officer or employee of an approved treatment facility who acts in compliance with this section is acting in the course of official duty and is not criminally or civilly liable for false imprisonment.").

incapacitated by alcohol . . . ."); (Pls.' Br. Supp. Mot. Summ. J. at 20, ECF No. 69) ("Rivera believed Ms. Cibulka was incapacitated by alcohol . . . ."); (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 95, 97.)  As Wis. Stat. § 51.45(11) requires, Officer Rivera took Shelly to an approved public treatment facility, where it is undisputed that her blood alcohol content was documented at 0.159, almost twice the legal driving limit in Wisconsin.[3]  (Pls.' Resp. CDPUF ¶ 97, ECF No. 84.)  Nothing in this set of facts shows an ulterior motive or achievement of some goal not contemplated by Wis. Stat. § 51.45(11).

Moreover, Plaintiffs' reliance on *Maniaci v. Marquette University,* 50 Wis. 2d 287, 289–93, 299–302, 184 N.W.2d 168 (1971), is misplaced.  *Maniaci* illustrates how the plaintiff—a university student attempting to drop out of school—could maintain an abuse-of-process claim under Wisconsin law against a private university and its employees, who contacted law enforcement to place the plaintiff into mental-health protective custody to prevent her from leaving school.  *Id.*  Notably, *Maniaci* does not indicate how (or whether) an abuse-of-process claim is cognizable against the individual law enforcement officers who were contacted to take the plaintiff into protective custody, as none of those officers were named defendants in the case. *Id.*  Rather, the Supreme Court of Wisconsin reasoned that there was evidence of abuse of process on the part of the university officials because their purpose in contacting law enforcement "was not essentially to have inquiry into [the plaintiff's] mental condition . . . [but] to detain her until such time as her parent had been notified and he had either given his permission for [her] to leave or had directed [her] to stay at school."  *Id.* at 300.  In other words,

---

[3] Wis. Stat. §§ 340.01(46m), 346.63(1)(b), prohibit operating a motor vehicle with a blood alcohol concentration of 0.08 or more.

the law enforcement officers in *Maniaci* were part of the "legal process" that the university and its officials allegedly abused. *See id.* at 296 ("[The plaintiff] was arrested by legal process in the sense that the document executed by the defendants under the statute conferred authority or jurisdiction upon the police officers to take physical custody of the plaintiff's person and to deliver her to the mental hospital.").

Here, Emily's actions in contacting law enforcement and informing dispatch of her parents' intoxication more closely resembles the actions of the defendants in *Maniaci* than Officer Rivera's acts in responding to Emily's calls. *See* (City Defs.' Resp. Pls.' PFOF ¶ 21, ECF No. 76); (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 25–28.) For instance, Emily's testimony seems to indicate that she had more than one purpose in contacting law enforcement, as she testified that she informed police dispatch that her parents were intoxicated and walking away from her, but also that she was essentially calling the police to give her the same service that she sought from a taxi. (City Defs.' Resp. Pls.' PFOF ¶ 21, ECF No. 76.) By contrast, it is undisputed that Officer Rivera believed Shelly was incapacitated by alcohol and he transported her to a detoxification facility based on that belief, all of which is expressly contemplated and required under Wis. Stat. § 51.45(11). *See* (*id.* ¶ 105); (Pls.' Br. Supp. Mot. Summ. J. at 20, ECF No. 69); (City Defs.' Repl. Pls.' Resp. CDPUF ¶¶ 95, 97.) Thus, *Maniaci* is inapplicable and unhelpful here.

Because the undisputed evidence in this case shows that Shelly Cibulka appeared to Officer Rivera to be incapacitated by alcohol, and because there is no evidence that Officer Rivera had some ulterior motive or somehow took actions beyond the process contemplated under Wis. Stat. § 51.45(11), Shelly's abuse-of-process claim fails as a matter of law.

19

Accordingly, Officer Rivera is entitled to judgment as a matter of law on Shelly's newly alleged abuse-of-process claim under Wisconsin law.

> **C.  Even Assuming Plaintiffs Pled a State-Law Claim for Abuse of Process, Such Claim is Barred Because Officer Rivera is Entitled to Discretionary Immunity under Wis. Stat. § 893.80.**

Governmental immunity under Wisconsin law is "extremely broad." *Estate of Perry v. Wenzel*, 872 F.3d 439, 463 (7th Cir. 2017), *cert. den'd*, 138 S. Ct. 1440 (Apr. 2, 2018).  Such immunity is committed to the Wisconsin statutes as follows:

> No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees **nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions**.

Wis. Stat. § 893.80(4) (emphasis added); *see also Lodl v. Progressive Northern Ins. Co.*, 2002 WI 71, ¶ 20, 253 Wis. 2d 323, 646 N.W.2d 314.

Wisconsin's governmental immunity broadly "'provides that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties.'" *Perry*, 872 F.3d at 462 (quoting *Pries v. McMillon*, 326 Wis. 2d 37, 784 N.W.2d 648, 654 (2010)).  "Wisconsin courts have interpreted this protection as extending to all conduct involving 'the exercise of discretion and judgment.'" *Thomas v. Correctional Healthcare Companies, Inc.*, 15–CV–633–JPS, 2016 WL 7046795, at *4 (E.D. Wis. Dec. 2, 2016) (quoting *Milwaukee Metro Sewerage Dist. v. City of Milwaukee*, 277 Wis. 2d 635, 672, 691 N.W.2d 658 (2005)).

"There are four exceptions to this broad doctrine: '(1) the performance of ministerial duties; (2) the performance of duties with respect to a 'known danger;' (3) actions involving medical discretion; and (4) actions that are 'malicious, willful, and intentional.'" *Perry*, 872 F.3d at 462 (quoting *Bicknese v. Sutula*, 260 Wis. 2d 713, 660 N.W.2d 289, 296 (2003)).

Here, Plaintiffs only argue that the fourth exception applies, asserting, without evidentiary support, that Officer Rivera's actions were malicious, willful, and intentional. Plaintiffs have not presented a scintilla of evidence that Officer Rivera acted with culpable malice, willfulness, or intent in deciding to take Shelly to a detoxification facility. It is undisputed that Shelly's blood alcohol content at the time she arrived at the facility was twice the legal driving limit. (Pls.' Resp. CDPUF ¶ 97, ECF No. 84); Wis. Stat. §§ 340.01(46m), 346.63(1)(b). Moreover, Plaintiffs admit that Officer "Rivera believed Ms. Cibulka was incapacitated by alcohol . . . ." *See* (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 40, ECF No. 81.) In short, there is simply no evidence whatsoever that Officer Rivera exhibited any culpable state of mind, such as malice, as he decided to take Shelly to a detoxification facility. Thus, the fourth exception to discretionary immunity is inapplicable here.

Because none of the judicially-created exceptions to Wis. Stat. § 893.80(4) governmental immunity apply in this case, Officer Rivera is statutorily immune from Plaintiffs' newly pled state-law claim. Accordingly, the Court should grant summary judgment on Plaintiffs' abuse-of-process claim.

**D. Even Assuming Plaintiffs Pled a State-Law Claim for Abuse of Process, Such Claim is Barred Because Plaintiffs Failed to Comply with the Notice Requirements of Wis. Stat. § 893.80.**

Section 893.80(1) applies to all state-law claims. *DNR v. City of Waukesha*, 184 Wis. 2d 178, 515 N.W.2d 888 (1994) (holding Wis. Stat. § 893.80 applies to all causes of action, not just those in tort and not just those for money damages); *see also Nesbitt Farms v. Madison*, 2003 WI App 122, ¶ 6 n.2, 265 Wis. 2d 422, 665 N.W.2d 379 ("continu[ing] to read *DNR v. City of Waukesha* as stating a general rule that the Wis. Stat. § 893.80(1) notice requirement applies to all actions against a municipality except for certain statutory actions excepted from the rule").

To substantially comply with statutory requirement of notice of claims against government bodies, a notice must satisfy two related but distinct notice requirements: (1) a notice of injury requirement of written notice of the circumstances of the claim signed by the party, agent or attorney, served on the governmental body in question within 120 days after the event causing the injury; <u>and</u> (2) a notice of claim requirement that requires notice of the claimant's identity and address, along with an itemized statement of relief sought, to the proper person at the governmental body <u>and subsequent denial</u>. Wis. Stat. § 893.80(1d)(a) and (b).

Compliance with both of these two distinct provisions is mandatory in order to avoid dismissal of an action. *Vanstone v. Town of Delafield*, 191 Wis. 2d 587, 530 N.W.2d 16 (Ct. App. 1995). "The notice of injury and notice of claim provisions of § 893.80(1) are unambiguously stated in the conjunctive; therefore, both provisions must be satisfied before the claimant may commence an action against a governmental agency." *Snopek v. Lakeland Med. Ctr.*, 223 Wis. 2d 288, 301, 588 N.W.2d 19 (1999). "Failure to comply with this statute

constitutes grounds for dismissal of the action." *Casteel v. Baade*, 167 Wis. 2d 1, 10, 481 N.W.2d 277 (1992).

Plaintiffs initiated this action before filing a notice of claim, itemization of relief sought, and receiving a disallowance of claim from the City of Madison in relation to Shelly's newly alleged abuse-of-process claim under Wisconsin law. (CDSPUF ¶¶ 1–3.) Accordingly, any newly alleged state-law claims are statutorily defective under Wisconsin law and must be dismissed. *Dobrev v. Walworth County Department of Health and Human Services*, Case No. 16-cv-1-jdp, 2018 WL 3109078, at *7–8 (W.D. Wis. June 25, 2018) ("[H]ere, [the plaintiff] *never* sent a notice of claim to defendants. So his state-law claims are barred by Wisconsin's notice-of-claim statute."). For this reason alone, the City Defendants are entitled to judgment as a matter of law as Shelly's newly alleged state-law claim.

## CONCLUSION

Based on the foregoing, the City Defendants respectfully request that their Motion for Summary Judgment be granted, dismissing Todd Cibulka's and Shelly Cibulka's claims in their entirety, with prejudice, on the merits, and with costs.

Dated this 16th day of September, 2019.

By: /s/ Benjamin A. Sparks
    SAMUEL C. HALL, JR.
    State Bar No. 1045476
    BENJAMIN A. SPARKS
    State Bar No. 1092405
    Attorneys for Defendants
    City of Madison, MPD Officers Hector Rivera, Jose Martinez, Hannah Boulden, Trent Scalon, and Jamar Gary
    CRIVELLO CARLSON, S.C.
    710 N. Plankinton Avenue, Suite 500
    Milwaukee, WI 53203
    Phone: (414) 271-7722
    Fax: (414) 271-4438
    E-mail: shall@crivellocarlson.com
    E-mail: bsparks@crivellocarlson.com