IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TODD CIBULKA and SHELLY CIBULKA,

                       Plaintiff,

     v.

CITY OF MADISON, DANE COUNTY SHERIFF'S         OPINION and ORDER
OFFICE, BARRETT ERWIN, COREY JOHNSON,
JEFF ELLIS, HECTOR RIVERA, JOSE MARTINEZ,          18-cv-537-jdp
HANNAH BOULDEN, TRENT SCALON, JAMAR
GARY, MARK ANDERSON, BRANDI ANDERSON,
LUKE DEIBELE, NATHAN KATZENMEYER,

                    Defendants.

Plaintiffs Todd Cibulka and Shelly Cibulka visited Madison, Wisconsin to attend a University of Wisconsin Badger's football game, after which they went drinking with friends. They became intoxicated and their daughter Emily Cibulka, a student at UW, met Todd and Shelly with the intention of driving them home. Emily was concerned and upset by her parents' behavior and called the police. Law enforcement officers from the City of Madison and University of Wisconsin responded. The interaction between the officers and the Cibulkas started out as a routine welfare check, but the interaction ended with Shelly being committed involuntarily to a detox facility, and with Todd being arrested, forced into a transport van, and held for more than four hours at Dane County jail. In this lawsuit, Todd and Shelly contend that officers from the City of Madison, University of Wisconsin, and Dane County violated their Fourth Amendment rights in numerous ways. The Cibulkas also contend that the city and county are liable for the officers' actions because municipal policies and practices caused the constitutional violations.

Before the court are motions for summary judgment filed by the university defendants, Dkt. 47, county defendants, Dkt. 55, city defendants, Dkt. 60, and plaintiffs, Dkt. 68. In considering defendants' motions, the court must view the evidence in the light most favorable to plaintiffs. But even with this perspective, plaintiffs have failed to show any violation of their constitutional rights, and defendants are entitled to qualified immunity on all plaintiffs' claims. Defendants' motions will be granted, plaintiffs' motion will be denied, and this case will be closed.

## UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

### A. The parties

Plaintiff Todd Cibulka and Shelly Cibulka live in Poynette, Wisconsin. Their daughter Emily Cibulka, who is not a party to this case, is a student at the University of Wisconsin in Madison.

Todd and Shelly have sued law enforcement officers from three agencies. Defendants Barrett Erwin, Corey Johnson, and Jeffrey Ellis are police officers with the University of Wisconsin Police Department (UWPD). Defendants Hector Rivera, Jose Martinez, Hannah Boulden, Trent Scanlon, and Jamar Gary are police officers with the City of Madison Police Department (MPD). Defendants Nathan Katzenmeyer, Mark Anderson, Brandi Anderson, and Luke Deibele are deputies with the Dane County Sheriff's Office.

### B. Background events of October 17, 2015

On October 17, 2015, Todd and Shelly Cibulka traveled from their home in Poynette, Wisconsin to attend the University of Wisconsin Badgers football game in Madison,

Wisconsin. They parked their car at a parking ramp near the capitol and walked to the stadium. Their daughter Emily was 18 years old and a freshman at UW at the time. Emily communicated with her parents with text messages and phone calls throughout the day. Emily, Todd, and Shelly planned to meet after the game and travel back to Poynette together.

At around 2 p.m., Todd and Shelly left the game and went to a bar. They stayed at the bar until approximately 7 p.m., drinking and socializing with friends. During those approximately four and one-half hours, Todd and Emily each consumed several alcoholic beverages. Emily had trouble communicating with Todd and Shelly while they were at the bar. By 6:30 p.m., Emily had grown impatient with Todd and Shelly. She had called them several times without success, and she wanted to leave Madison. Emily walked with a friend to the bar to find her parents.

At around 7:00 p.m., Emily and her friend arrived at the bar just as Todd and Shelly were exiting it. Todd and Shelly told Emily that they wanted to walk to their car, and they started walking west on Johnson Street toward the capitol. Emily noticed that Todd and Shelly had slurred speech, that Todd was swaying, and that both Todd and Shelly appeared to be too intoxicated to drive. Todd and Shelly were moving slowly, giggling, and telling Emily that they did not want to be rushed. Emily and her friend asked Todd for his keys, but he refused to give them up. Todd also would not tell Emily or her friend where the vehicle was parked. Emily was frustrated and upset by her parents' behavior.

Emily called a taxi, hoping that the taxi could take them all to Todd and Shelly's vehicle. When the taxi arrived, Todd and Shelly ignored Emily, refused to get in the taxi, and kept walking. Emily then called MPD's nonemergency number. Because Emily told the dispatcher that she was at Union South, which was outside of MPD's jurisdiction, the dispatcher

transferred Emily's call to UWPD. Emily told a UWPD dispatcher that her parents had been drinking and were intoxicated, that she could not get them to ride in a cab, that they kept walking away from her, and that they were trying to get to their vehicle. The UWPD dispatcher told Emily that officers would be there shortly, and UWPD officers Erwin and Johnson were dispatched to Emily's location. The dispatcher reported on the radio:

> Caller is very upset because parents have been drinking all day, are intox, and she's trying to drive them home. They are refusing to tell her where the truck is parked, and she is concerned her father will become more upset/start acting out. Caller would like an officer to meet her in front of U South on the Johnson side.

Meanwhile, Todd and Shelly continued walking along Johnson Street. Between five and ten minutes after Emily made her first call to MPD's nonemergency line, she called the nonemergency line again. Emily was concerned because her location had changed, no officers had arrived yet, and Todd and separated from the group to urinate between two houses. Emily told the dispatcher that she had called earlier and that no officers had arrived yet. MPD Officer Rivera was dispatched to perform a welfare check in response to Emily's second call. The MPD dispatcher reported that Emily was:

> Walking on W. Johnson. Parents are intox and walking away from the caller. They keep walking down Johnson St, intox, stumbling all over. I had originally transferred Emily to UWPD as when she called, she was at Union South. They have units enroute. I updated UWPD as to the location. Now at Mills St, caller afraid her dad will fall into the street.

After Emily called the police the second time, Todd and Shelly sat down on a short retaining wall adjacent to Johnson Street.

## C. Law enforcement's initial contact with the Cibulkas

UWPD Officer Erwin and MPD Officer Rivera arrived at the Cibulkas' location on Johnson Street at the same time. Because the Cibulkas were now in MPD jurisdiction, Rivera

took lead as the primary officer. Rivera asked Erwin to stay and help. Erwin agreed to stay and assist because it was standard protocol at UWPD to send multiple officers when contacting intoxicated people. Rivera and Erwin spoke with Emily and her friend first. The officers introduced themselves and tried to determine what kind of help Emily needed. Emily was crying. She told the officers that her parents had been drinking, that they would not get into a cab, that they continued to walk along Johnson Street, and that she was getting anxious about the situation. Emily requested a ride to where her parents' car was parked.

UWPD Officer Johnson arrived shortly thereafter. He was with UWPD Officer Heather Banuelos, who was training Johnson. (Banuelos is not a defendant in this case.) Johnson asked Emily for a quick summary of what had happened. (Johnson's squad video recorded the conversation between Johnson and Emily.) Emily told Johnson that her parents wanted her to drive them home because they had been drinking. She said that she had never seen her dad like this, that her parents were stumbling and falling in the street, that they had refused to get into a taxi, that she did not know where the car was, and that her dad had refused to give her the keys. Based on Johnson's conversation with Emily, Johnson understood that Emily was worried about her parents' safety and was trying to figure out a way to get them home safely or to a hotel. Johnson told Emily that the officers could take her parents to their vehicle.

Meanwhile, Officer Erwin went to talk to Todd and Shelly, who were still sitting on the retaining wall. Todd told Erwin his name. Erwin spoke with Todd and Shelly for about ten minutes, mostly engaging in small talk about the football game and their daughter's dorm. He did not ask the Cibulkas for identification, did not accuse them of anything, and did not attempt to search them. Erwin noted that Todd and Shelly smelled strongly of alcohol, and

that they had slurred speech and red, bloodshot eyes. Erwin had a difficult time communicating with Todd and Shelly because they were highly intoxicated.

Officer Rivera then attempted to talk with Todd and Shelly. Rivera wanted to find out where the Cibulka's vehicle was located so that he could arrange for everybody to be settled safely somewhere. Rivera asked Todd and Shelly where the vehicle was located, but they were giggly and evasive. Todd pointed in an easterly direction without providing any detail, and Shelly said the vehicle was near the capitol. The Cibulkas both told Rivera they were fine, and then they declined to answer any more questions.

Rivera returned to Emily to find out whether she was comfortable driving her parents back to Poynette in their intoxicated state. He was concerned that Todd and Shelly might be belligerent or uncooperative with Emily, because he perceived them as being belligerent and uncooperative with him. Emily responded that she was comfortable driving her parents back if they agreed to stay in the back seat of the truck. She asked if the police could prevent her parents from leaving, and an officer responded that her parents were adults and could leave if they chose to.

### D. Todd is detained, arrested, and taken to Dane County jail

Around this time, Todd stood up, leaned forward, and took a couple of steps towards Johnson Street. Todd was not steady on his feet. (Although plaintiffs argue in their brief that Todd was not having trouble balancing, Todd admitted at his deposition that he did not "necessarily stand straight up perfectly still," and he did not deny that he may have swayed or staggered. Dkt. 46, at 28.) Officer Erwin was standing in front of Todd and thought that Todd might stumble into Johnson Street, which had heavy traffic at the time. Erwin caught Todd by the shoulders and chest and then shifted his grasp to Todd's upper arm. Erwin told Todd that

he needed to sit down because he had almost fallen into the busy street. Todd responded that he was "good," and that he was not going to sit down. Todd asked Erwin to let go of him, but Erwin refused. Todd pulled his hands toward his chest with his elbows out to try to maintain his stance and get away from Erwin. Erwin perceived Todd as clenching his fists and tightening up.

The parties dispute how close Todd was to Johnson Street and whether he was actually in danger of falling into the street. Erwin says that Todd nearly stumbled into traffic and that he had to help Todd stand upright. Todd says that he was always upright, that there was no risk of him falling into traffic, and that any unsteadiness was caused by Erwin grabbing him. Although a portion of the incident was captured on Erwin's squad car video, it is difficult to tell from the video how close Todd was to the street when he stood up. The video shows Todd standing up and taking multiple steps toward Johnson Street, and Erwin reaching out to stop Todd.

Rivera was still talking with Emily when he heard Erwin tell Todd to sit back down. Rivera turned and saw Todd and Erwin standing close together, face to face. Rivera was concerned that there might be a physical encounter between Todd and Erwin, so Rivera went to assist Erwin. Rivera stood in front of Todd, placing one hand on Todd's arm and another on Todd's back. Johnson also approached Todd, reaching for Todd's right arm. At this point, Erwin can be heard on Johnson's squad video saying, "Just take a seat, Todd," with Todd responding, "No, I don't want to . . . I'm not taking a seat, okay." Emily can be heard saying, "They're helping you dad," after which Shelly can be heard saying, "No, they're not helping him."

Erwin continued to hold Todd's right side. Todd tried to maintain his balance and get away from Erwin by stiffening his body, tensing his muscles, raising his arms up, pulling his arms away, and pushing his elbows out. (Todd is 6 feet 3 inches tall and weighed approximately 265 pounds. Erwin is five feet, eight inches and 160 pounds.) Because Todd was moving and pulling away, Johnson grabbed Todd's left wrist and forearm, attempting to place him in an escort hold. The officers asked Todd to relax and sit down. Todd was agitated, refused to sit, and continued to attempt to pull away from the officers. The officers told Todd to stop resisting them. The officers decided to "decentralize" Todd, which means bringing a resistive subject to the ground to reduce the risk of harm to the officer, subject, or others.

Rivera and Johnson moved Todd's arms across his chest, so that Todd would be forced to lean forward toward the ground. Because Todd is about three inches taller than Johnson, Johnson jumped to get a better hold on Todd. Todd, Johnson, Rivera, and Erwin tumbled to the ground. Todd landed partially on top of Rivera. Rivera crawled out from under Todd and secured Todd's legs and feet, while Erwin and Johnson placed Todd's hands behind his back. Todd yelled at the officers to get off him, and he tried to move his arms away. The officers told Todd to stop resisting. Todd relaxed, and Erwin and Johnson were able to handcuff him. They used two sets of handcuffs to account for Todd's size.

Once Todd was handcuffed, officers told him to take some deep breaths and they asked him whether he was hurt or needed medical attention. Todd complained that the handcuffs were hurting his wrists, but Todd declined to be seen by EMS. Officers helped Todd up into a standing position and then escorted him to a nearby UWPD squad vehicle, where Erwin was going to place him in order to let the situation deescalate. Rivera considered Todd to be

cooperating at that point, so he stepped away to speak with Emily. Johnson left the scene shortly after Todd was handcuffed.

Officer Erwin rubbed Todd's back and talked to him, stating "Todd, the fight is over. Nobody wants to hurt you. You're okay. Where does it hurt? . . . Does your chest hurt? Do your arms hurt? Do your knees hurt?" Erwin and other officers brought Todd to a standing position. Todd asked if the handcuffs could be removed because they hurt, but Erwin refused to remove them. Erwin wanted to put Todd in a squad car. There was lots of foot and vehicular traffic, and Erwin did not want people staring at Todd with handcuffs on. Erwin also wanted to restrict Todd's movement, so that officers could talk to Emily and Shelly without worrying about Todd's behavior. Todd walked willingly to the squad car, but he refused to get into the car. Erwin spoke to Todd in a calm, slow voice. Erwin told Todd that the officers were trying to stabilize the scene so that they could talk to Todd and get some information. Erwin told Todd that he had no plans to take him anywhere.

Todd sat partially in the back of the squad car, placing his left leg into the car and ducking his head and most of his torso into the car. UWPD Officer Burgoni then got into the backseat from the other side of the squad car. (Burgoni is not a defendant in this case.) Erwin intended to hand Burgoni the seatbelt, so that Erwin would not have to lean directly in front of Todd and risk being bit, head-butted, or spit on. But Todd refused to get into the car all the way. Burgoni pushed a pressure point on Todd's jaw in an attempt to get Todd into the car. Todd thought Burgoni was choking him, and he yelled out, "Get his hands off my neck!" Todd then hooked his right foot to the frame of the car and attempted to exit the car. Todd said he was fine and wanted to leave and go home. Erwin ordered Todd to get back into the car, and

he tried pushing Todd back into the car. Ultimately, Erwin decided that he could not push Todd into the car without hurting him, so he let Todd exit the car.

Meanwhile, defendant UWPD Sergeant Ellis and his partner Sergeant Buckley (who is not a defendant) had responded to the scene. During the physical encounter between Todd, Rivera, Erwin, and Johnson, Officer Banuelo had radioed for backup, stating that officers were fighting with a subject on the ground. Ellis and Buckley arrived in time to see several officers on the ground with Todd. It appeared to Ellis that Todd was fighting with the officers. Ellis activated his body camera. After Todd was handcuffed and brought to a seated position, Ellis stepped away with Banuelos to receive a debriefing and summary of the events that had taken place. Banuelos told Ellis that the Cibulkas were very intoxicated, that Emily had called for police help, that Todd would not listen and had started fighting with the officers, that Shelly had gotten really "mouthy," and that both parents were uncontrollable. Banuelos also told Ellis that Emily was an "absolute disaster," and that she had "never seen her parents like this."

While Ellis was speaking with Banuelos, he saw Erwin and Burgoni struggling to get Todd into the back of the squad car. At that point, Erwin was exhausted, so Ellis took over with Todd. Ellis spoke to Todd for approximately 15 minutes, trying to persuade him to sit in the squad car, asking him not to behave poorly in front of his distressed daughter, and telling him that the officers did not want to fight or hurt anyone. Todd agreed that Emily thought he was not coherent, but he stated that he was not going to be forced into a squad car, that someone had tried to push him in there, that another officer had grabbed his throat, and that he was standing up for his rights. Ellis kept one hand on Todd, stating that Todd would get hurt if he fell while wearing handcuffs.

Ellis eventually concluded that Todd was not going to get into a squad car voluntarily. MPD Officer Rivera then tried talking to Todd. Todd refused to answer questions. By this time, more MPD officers had arrived, at Rivera's request, including defendants Officer Jose Martinez and Sergeant Jamar Gary. The MPD officers told Todd that he was under arrest for disorderly conduct. Rivera requested that Todd be moved to the back of an MPD squad car. Todd was uncooperative. He yelled loudly, tensed his arms, locked his hip and knee joints, and used deadweight and counterbalance measures to resist being moved. Ellis assisted in escorting Todd and attempting to place him in an MPD squad car, but because of Todd's size, strength, and resistive behavior, the officers could not get Todd into the car. MPD eventually requested an arrest transport van to transport Todd to Dane County jail. When the transport van arrived, Todd refused to enter it and stiffened his body to resist being placed inside. Several officers pushed and lifted Todd into the back of the van. Todd kicked at the officers, so the officers applied leg restraints. Eventually, the officers got Todd into the van and transported him to Dane County jail. Sergeant Gary rode in the back of the van to ensure that Todd did not hit his head during transport. Todd did not report any medical problems or injuries to Gary.

### E. Shelly Cibulka is transported to a detox facility

While Todd was struggling with officers, Shelly Cibulka was being detained by MPD officers. She had stood up from the retaining wall near Johnson Street when Todd began physically struggling with police officers on the sidewalk. She was upset and had tried to talk to the officers struggling with Todd. Officer Banuelos and another officer handcuffed Shelly and led her away. She was eventually placed in the back of Officer Rivera's squad car.

After the transport van took Todd from the scene, Rivera transported Shelly to the Tellurian detoxification center for temporary protective custody under Wis. Stat. § 51.45(11).

Rivera thought Shelly was incapacitated by alcohol due to her bloodshot and glassy eyes, slurred speech, unsteady walk, inability to say where her vehicle was parked, and refusal to cooperate with Emily. But Rivera did not give Shelly a preliminary breath test before he brought her to Tellurian. After she was checked in to Tellurian, Shelly asked if she could leave, but she was told that she could not leave and could not use a telephone. She was placed in a room by herself. Tellurian staff recorded that Shelly's blood alcohol content was 0.159. She checked out of Tellurian at around 9:00 a.m. the following day, October 18, 2015.

### F.  Todd is held at Dane County jail

At 8:30 p.m., the Dane County jail received a call from police dispatch stating that an uncooperative new arrestee was being brought to the jail, and that the arresting officers were requesting assistance upon their arrival. Defendant Deputy Katzenmeyer was the booking deputy at the time, and he called for additional deputies to respond to the booking area. Four deputies and a jail supervisor arrived to assist, including defendants Mark Anderson, Brandi Anderson, and Luke Deibele. When the MDP transport van arrived with Todd, an MPD sergeant told Katzenmeyer that Todd was combative, resistive, and had used dead weight tactics during the arrest. The sergeant also told Katzenmeyer that Todd had been arrested on misdemeanor charges of disorderly conduct and resisting arrest.

Katzenmeyer introduced himself to Todd and asked him if he would cooperate. Todd did not respond, so Katzenmeyer told Todd that he would be put in a restraint chair. Todd then said that he would cooperate. Todd's leg shackles were removed, he was escorted to the booking room, and he was searched by deputies. Deputies could smell a strong odor of intoxicants and believed Todd was intoxicated, but they could not tell how intoxicated he was.

Because Todd was cooperative, deputies removed the handcuffs and asked Todd to sit down on a chair located in the booking area.

Under Dane County jail policy, all arrestees brought to the jail must complete the jail's booking process before they can be released. First, the arresting officers escort the arrestee into the search area, where a Dane County jail booking deputy performs a pat search and removes the arrestee from handcuffs. The arrestee then sits in the new arrest search area, while the arresting officer briefs the booking deputy, provides paperwork, and completes booking forms. The booking deputy asks the arrestee medical questions, including mental health questions, and asks the arrestee to provide a preliminary breath test. After completing these steps, individuals arrested for misdemeanor offenses are given the option to post bail immediately. If the individual is going to be held at the jail, additional booking procedures apply. If an inmate refuses to complete the booking process, the inmate is placed in an individual segregation cell until he agrees to comply.

Katzenmeyer asked Todd some questions about his medical and mental health, and asked Todd to take a breathalyzer test. Todd was calm and quiet, but he refused the breathalyzer test and would not answer Katzenmeyer's questions. Katzenmeyer told Todd that the breathalyzer test was required, and that if Todd refused it, he would be held at the jail and would have a difficult time posting bail. If Todd cooperated, he would be able to complete the booking process and post bail.

Todd continued to refuse to provide the breathalyzer test and to answer medical questions. In compliance with Dane County jail policies, Katzenmeyer ordered that Todd be moved to a segregation cell until he agreed to complete the booking process. Deputies asked Todd to stand up and come to segregation. Todd refused. Deputies attempted to lift Todd up

13

from the chair, but Todd remained seated, stiffened his body, and pressed his body back against the chair to prevent deputies from lifting him. He yelled, "I'm not fighting." Deputies were unable to escort Todd to a segregation cell because of his resistance. They warned him that they would use a restraint chair if he did not get up. Todd continued to resist, so Katzenmeyer decided to use the restraint chair to transport Todd to a segregation cell. After a restraint chair was brought, Todd refused multiple orders from deputies to sit in the chair.

Correctional officers are taught that the safest and most effective way to place a subject in a restraint chair is to apply the restraint straps one at a time, in a particular order, with the assistance of five officers. If there are more than five officers, the officers' actions could work against each other. Non-correctional law enforcement officers are generally not trained to use restraint chairs.

In this instance, Katzenmeyer and the other deputies could not follow the optimal procedure for placing Todd in the restraint chair. Deputies attempted to move Todd into the restraint chair, but Todd engaged in a physical struggle with the deputies. Eventually, nine law enforcement officers (four deputies, one supervisor, and four MPD officers) moved Todd into the chair. Todd tensed and twisted his body, moved his arms, attempted to stand up, and thrust his hips away from the restraint chair. MPD Sergeant Gary restrained Todd's upper-body, MPD Officer Scanlon assisted with securing Todd's legs, and MPD Officer Martinez secured Todd's feet. At one point, Martinez put his own feet on the wall behind him to keep Todd from extending his legs and lifting Martinez off the ground or kicking other officers.

Deputy Katzenmeyer placed his knee on a pressure point on Todd's thigh to prevent him from standing up, and deputies were able to fasten the waist restraint. (Katzenmeyer testified at his deposition that putting his knee on Todd's thigh to gain compliance was a

technique he learned as a wrestler.) Deputies struggled to secure the wrist restraints, so Katzenmeyer used a "wrist compliance hold," that involved bending Todd's wrists and placing pressure on a nerve bundle. Katzenmeyer ordered Todd to relax and sit up, but Todd refused, and Todd continued to twist and turn his body and bend forward. Katzenmeyer applied a compression hold to a nerve bundle under Todd's jaw. This compression hold caused Todd to sit back and upright, at which time deputies were able to secure the shoulder restraints.

After Katzenmeyer released the compression hold, he held Todd's head to prevent Todd from head butting, spitting, or shaking the chair while deputies secured and checked all the restraints. A deputy placed a spit-hood on Todd so that a nurse could safely check the straps and conduct a medical evaluation. A spit hood is a mesh netting that still allows inmates to breath, see, and talk, but prevents them from expelling saliva on others. At this time, Todd had not tried to spit on anyone; the hood was just a precaution.

A nurse came to the booking area to conduct a medical evaluation of Todd, to check the restraints, and to determine whether to accept Todd for incarceration. (Plaintiffs argue that the nurse did not check the restraints or conduct a medical evaluation, but video footage shows the nurse checking the restraint straps and talking with Todd for a couple of minutes. And jail records show that the nurse checked Todd's capillary refill to all his extremities, which is the process used to verify that the straps on the restraint chair are safely administered.) The nurse confirmed that Todd was safely and properly secured in the restraint chair. Todd did not report any injuries or medical problems to the nurse, and he did not request any medical care. He did say that he took blood sugar medication, so the nurse checked his blood sugar. (During his deposition, Todd could not explain why he told the nurse he took blood sugar medication, as he does not actually take it.) The nurse then accepted Todd for incarceration, and Todd was

taken to a segregation cell. The spit hood was removed when Todd was placed in the segregation cell.

Todd was held in the restraint chair, in the segregation cell, for approximately two hours. (Todd says that he was unconscious for much of the time he was in the chair in a cell. But he has no evidence that he was unconscious besides his own say-so, which appears to be based solely on his inability to remember his time in segregation clearly. The video footage from the segregation cell shows that Todd's eyes were open during part of the time he was in the cell. At other times, he appears to close his eyes and fall asleep.) While he was in segregation, he was monitored through video surveillance by the segregation deputy, Deputy Torres, and was checked by deputies from outside the segregation cell on more than 20 occasions during the two-hour period. (Plaintiffs attempt to dispute whether Todd was monitored adequately, but they offer no evidence to refute the county defendants' statements that Todd was checked every five minutes while he was in segregation. Plaintiffs also offer no evidence to support a finding that the checks were superficial or inadequate.) Todd did not ask to use the restroom, did not report any medical problems, and did not request any medical attention. Jail mental health staff attempted to speak with Todd on three separate occasions while he was in the restraint chair, but Todd was heavily intoxicated, and staff had difficulty engaging with him. Mental health staff noted that Todd denied suicidal thoughts.

At approximately 10:30 p.m., Todd was transferred to a different cell and was removed from the restraint chair. He was provided a jail uniform. A nurse assessed Todd at 12:01 a.m., checking his temperature, pulse, respirations, blood pressure, and oxygen saturation. Todd did not report any injuries or medical problems at that time, and nurse did not note any. Shortly after 2:00 a.m., Todd completed the booking process and was released from jail. (It is not clear

from the records what Todd did to complete the booking process. The jail records do not show whether Todd every completed a breathalyzer test, answered medical questions, or was assessed for his ability to drive home.)

Todd was released from jail around 2:30 a.m. on October 18, 2015. After getting out of jail, Todd went to the parking ramp where his vehicle was parked and, instead of paying the fare to leave, he drove his truck through the gate, breaking it.


ANALYSIS

Plaintiffs Todd and Shelly Cibulka raise the following claims:

1) defendants Erwin, Johnson, Rivera, and Ellis falsely arrested Todd;

2) defendants Erwin, Johnson, Rivera, Ellis, Martinez, and Gary used excessive force against Todd when they arrested him;

3) defendant Katzenmeyer falsely imprisoned Todd by failing to let him post bail immediately;

4) defendants Katzenmeyer, Deibele, Mark Anderson, and Brandi Anderson subjected Todd to excessive force at the Dane County jail;

5) defendants Katzenmeyer, Deibele, Mark Anderson, and Brandi Anderson deprived Todd of adequate medical care at the Dane County jail;

6) defendant Rivera subjected Shelly abuse of process by taking her into protective custody without adequate justification; and

7) the City of Madison and Dane County's unconstitutional policies and procedures, and failure to properly train, supervise, and discipline officers, caused the constitutional violations.

Plaintiffs have moved for summary judgment on all their claims except their municipal liability claims. Defendants have moved for summary judgment on all plaintiffs' claims.

## A. Todd Cibulka's false arrest claim

The Fourth Amendment prohibits unreasonable searches and seizures. *Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012). As a general rule, a seizure by a law enforcement officer is reasonable only when the officer has probable cause to believe that the individual has committed a crime. *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014); *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011). There are several exceptions, including the longstanding exception for brief investigatory detentions that are supported by an officer's reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). Another exception is the community caretaker doctrine, which authorizes law enforcement to take certain actions unrelated to criminal law enforcement to protect the public. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553 (7th Cir. 2014); *State v. Blatterman*, 2015 WI 46, ¶ 39, 362 Wis. 2d 138, 166, 864 N.W.2d 26, 39.

Todd Cibulka contends that defendants Erwin, Johnson, and Rivera violated his Fourth Amendment rights by detaining him without reasonable suspicion of criminal activity, and that Erwin, Rivera, Ellis, Martinez, and Gary arrested him without probable cause that he had committed a crime. The UWPD defendants respond that the officers' initial seizure of Todd was reasonable under Wisconsin's community caretaker doctrine or was a legitimate *Terry* stop. Both the UWPD and MPD defendants argue that by the time they arrested Todd, they had probable cause to believe he had committed the offenses of disorderly conduct and resisting arrest. Defendants also argue that even if their actions were not justified under the community caretaker doctrine or by probable cause, they did not violate any clearly established laws and are entitled to qualified immunity.

### 1. Community caretaker doctrine and qualified immunity

The Constitution permits local police officers to engage in certain community caretaking functions to protect members of the public, even if the officers' actions are unrelated to any criminal law enforcement purpose. *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *Long v. United States*, 847 F.3d 916, 921 (7th Cir. 2017). In *Cady*, the Supreme Court held that a warrantless search of an automobile in police custody did not violate the Fourth Amendment because the search was performed for safety reasons, not to detect or investigate criminal activity. *Cady*, 413 U.S. at 441. The Court of Appeals for the Seventh Circuit has limited the community caretaker doctrine to warrantless searches of automobiles. *Sutterfield*, 751 F.3d at 551. But Wisconsin courts have interpreted the doctrine more broadly, holding that a search or seizure may be justified under the community caretaker doctrine so long as the police officer is conducting a bona fide caretaker activity, and the public interest supporting the search or seizure outweighs the intrusion upon the privacy of the individual. *State v. Kramer*, 2009 WI 14, ¶ 21, 315 Wis. 2d 414, 759 N.W.2d 598.

Applying this standard, the Wisconsin Supreme Court concluded that police officers were exercising a legitimate community caretaking function when they performed a warrantless entry and sweep of a dwelling in response to a report suggesting that the occupants were unconscious, possibly as the result of drug abuse. *State v. Pinkard*, 2010 WI 81, 327 Wis. 2d 346, 785 N.W.2d 592 (2010). The court explained that ensuring the safety of the occupants and the property in a residence are legitimate community caretaker functions. *Id.*, ¶ 34. *See also In re Kelsey, C.R.*, 2001 WI 54, 243 Wis. 2d 422, 626 N.W.2d 777 (officers' seizure of a teenage girl who appeared to be a potential runaway was a legitimate community caretaker action); *State v. Horngren*, 2000 WI App 177, 238 Wis. 2d 347, 617 N.W.2d 508 (officers' warrantless

entry and search of home after receiving information about a suicide threat was a legitimate community caretaker action).

These Wisconsin cases are relevant here, because defendants contend that they are protected by qualified immunity from Todd Cibulka's false arrest claims. Qualified immunity shields government officials from money damages unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Qualified immunity gives government officials "breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011). The existing precedent must have placed the statutory or constitutional question beyond debate. *Id.* at 743. If there is no United States Supreme Court case that clearly establishes a right, Wisconsin cases are relevant to what a reasonable Wisconsin officer would have thought the law permitted in responding to a situation. *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (per curiam); *Sutterfield*, 751 F.3d at 573. Qualified immunity is an affirmative defense, but the plaintiff carries the burden of defeating it once it is raised. *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013).

In this case, the question is whether plaintiffs have shown that, in light of precedent existing at the time, defendants Erwin, Johnson, and Rivera were "plainly incompetent" in grabbing Todd to prevent him from walking toward the street, ordering Todd to stay seated, taking Todd to the ground and handcuffing him when he physically resisted and refused to comply, and attempting to place Todd in a squad car. Plaintiffs have not met this burden. Plaintiffs have pointed to no clearly established law that prohibited the officers from acting as community caretakers and seizing Todd under the circumstances present. Instead, the

undisputed facts show that a reasonable officer could have believed that such actions were justified under Wisconsin's broad interpretation of the community caretaker doctrine.

The first officers to interact with the Cibulkas—defendants Erwin, Rivera, and Johnson—were dispatched to perform a community caretaking function, not to investigate possible criminal activity. The officers were dispatched based on Emily Cibulka's calls to MPD's nonemergency number for assistance with her intoxicated parents. Emily did not report that her parents had engaged in criminal activity, and the officers considered the purpose of their visit to be a "welfare check." When the officers arrived at the Cibulkas' location, the officers did not act as though they were investigating potential criminal activity. They introduced themselves to the Cibulkas, and they asked Emily how they could assist her. When they spoke to Todd and Shelly, the officers did not accuse them of any crime, did not ask for identification, and did not suggest that Todd and Shelly had done anything wrong. Erwin talked about the football game and the university, and Rivera asked Todd and Shelly about the location of their vehicle. No officer made physical contact with Todd or Shelly until Todd stood up and walked toward Johnson Street. These initial communications fell squarely within reasonable community caretaking activities.

Plaintiffs contend that the officers' subsequent actions of seizing Todd, bringing him to the ground, handcuffing him, attempting to place him in a squad car, and ultimately, arresting him, were not reasonable community caretaking activities. But Erwin's decision to stop Todd from proceeding toward Johnson Street was a reasonable exercise of the community caretaker doctrine. Although the parties dispute how far Todd was from Johnson Street, how unsteady he was, and whether there was an actual risk of him falling into traffic, those disputes are not material. Todd admits he was intoxicated, did not stand up straight, and was not steady on his

feet. He could not remember at his deposition whether he swayed or staggered when he stood up. But even if Todd did not nearly fall into the street, it is clear from the squad car video that Todd stood up and walked toward Johnson Street. *See Scott v. Harris*, 550 U.S. 372, 378–80 (2007) (district court should not accept allegations clearly contracted by video evidence).

And Erwin had legitimate reasons to be concerned about Todd's unsteady movement toward the street. Erwin had been told by Emily and the dispatcher that Todd had been drinking all day, was intoxicated, and would not cooperate with Emily's efforts to get him home safely. Erwin had observed Todd's intoxicated state and had observed that Todd had difficulty conversing. The only reasonable conclusion is that Erwin stopped Todd from walking toward a busy street out of concern for Todd's safety.

Plaintiffs argue that Erwin could have simply let Todd go and ordered him to stand away from the curb. But an officer's behavior must be judged from the perspective of a reasonable officer on the scene, not by using hindsight. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). This was an uncertain situation, and the officers had legitimate reasons for thinking that Todd would not comply with an order to stand away from the curb. He had refused to cooperate with Emily, had essentially refused communicate with the police, and his behavior showed that he did not like being told what to do. A reasonable officer in Erwin's situation could have believed he was exercising a community caretaker function. *Cady*, 413 U.S. at 448 (acting to protect people or property is legitimate community caretaker function); *Sutterfield*, 751 F.3d at 551 (police play important role "in safeguarding individuals from dangers posed to themselves and others"). And that is all that matters for qualified immunity.

Johnson's and Rivera's decisions to intervene and assist Erwin were also reasonable. The officers saw that Erwin and Todd were standing close together and that Todd was refusing

Erwin's request that he sit down. Like Erwin, both Johnson and Rivera had legitimate reasons to be concerned about Todd's behavior and his safety. UWPD dispatch had reported that Emily was afraid her dad would become upset or "act out." MPD dispatch had reported that Todd was intoxicated and stumbling all over, and that Emily was afraid that Todd would fall into the street. Rivera had attempted to speak with Todd with no success, and Rivera perceived Todd as highly intoxicated and uncooperative. Emily told Johnson that she had never seen her dad like this, that her parents were stumbling and falling in the street, that they had refused to get into a taxi, that she did not know where the car was, and that Todd had refused to give his keys to a sober driver. Based on this information, Johnson and Rivera were reasonably concerned that Todd may either stumble or fall into the street and injure himself or others, or that there would be a physical altercation between Erwin and Todd. A reasonable officer could have believed that holding Todd and asking him to sit down was reasonable under the community caretaker doctrine.

It is a somewhat closer question whether it was reasonable under the community caretaker doctrine for the officers to take Todd down to the ground, handcuff him, and attempt to put him in a squad car. Plaintiffs argue that Todd's passive resistance was not sufficient justification for these actions, and that the officers were responsible for escalating the situation and agitating Todd. But under the circumstances, a reasonable officer could have concluded that the actions were necessary, or at least not prohibited, by Wisconsin's community caretaker doctrine. The officers held Todd for more than a minute while they encouraged him to sit down. On the squad car audio, it is clear that the officers remained calm during this time. Erwin told Todd that he was concerned for his safety, and that he felt Todd was going to fall if the officers let go of him. Todd admits that he tried break free from the officers. A reasonable

officer could have perceived Todd as being a safety risk, both to himself and the officers, and a reasonable officer could have concluded that bringing him to the ground and handcuffing him was appropriate. A reasonable officer also could have concluded that placing Todd securely in a squad car would stabilize the situation and prevent bystanders from observing Todd in handcuffs. Therefore, a reasonable officer could have concluded that the seizure of Todd was justified under, or at least not prohibited by, Wisconsin's community caretaker doctrine based on the public interest in safety and security. *See Pinkard*, 2010 WI 81, ¶ 52 (community caretaker doctrine permits police to take action to ensure safety of individuals whom police perceive reasonably as unable to "look after their own interests"); *In re Kelsey C.R.,* 2001 WI 54, ¶ 34 ("[P]olice may seize a citizen without a warrant, when the police are performing a community caretaker function[,]" so long as seizure satisfies the "reasonableness requirement of the Fourth Amendment."); *Minett v. Overwachter*, No. 18-CV-743-BBC, 2020 WL 224342, at *7 (W.D. Wis. Jan. 15, 2020) (holding that plaintiff's Fourth Amendment claim against officer who administered a breathalyzer test on suspicion that plaintiff was incapacitated by alcohol was barred qualified immunity under the community caretaker doctrine). Therefore, plaintiffs' claims arising out of the seizure of Todd before he was formally arrested are barred by qualified immunity.

## 2. Probable cause to arrest and qualified immunity

After the UWPD officers Erwin and Ellis tried unsuccessfully to put Todd in a UWPD squad car, MPD officers Rivera, Martinez, and Gary took over. At that point, the MPD officers arrested Todd for disorderly conduct, they tried to place him in an MPD squad car, and they eventually called for an arrest transport van. Plaintiffs contend that defendants had no probable cause to believe that Todd had committed any criminal offense. Defendants argue that they

24

had probable cause to arrest Todd for disorderly conduct and resisting arrest, and that even if they did not have probable cause, they are entitled to qualified immunity.

An officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge would lead a prudent person to believe that the suspect has committed an offense. *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). But a police officer assessing probable cause at the scene of a disturbance is not required to "determine whether a person's conduct satisfies all of the essential elements of a particular statute." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622–23 (7th Cir. 2010).

An officer is entitled to qualified immunity for a false arrest claim if a reasonable officer could have mistakenly believed that probable cause existed. *Fleming v. Livingston County, Illinois*, 674 F.3d 874, 878 (7th Cir. 2012). This standard is often called "arguable probable cause." *Id.* Arguable probable cause is established when "a reasonable police officer in the same circumstances and . . . possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Id.* at 880. To overcome a defendant's qualified immunity defense, plaintiff must identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam). Although it is not necessary to have a case directly on point, existing precedent must place the lawfulness of the particular arrest "beyond debate." *Wesby*, 138 U.S. at 590.

The question in this instance is whether a reasonable officer could have reasonably believed that probable cause to arrest for disorderly conduct or resisting arrest. Wisconsin's disorderly conduct statute has two elements: (1) the individual engaged in violent, abusive,

indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct; and (2) the individual's conduct occurred under circumstances where such conduct tends to cause or provoke a disturbance. *Gibbs*, 775 F.3d at 538 (*citing* Wis. Stat. § 947.01(1)). Wisconsin's resisting an officer statute also has two elements: (1) the individual knowingly resisted or obstructed an officer; and (2) the officer was performing an act in an official capacity and with lawful authority. Wis. Stat. § 946.41; *State v. Ferguson*, 2009 WI 50, ¶ 16, 317 Wis. 2d 586, 600, 767 N.W.2d 187, 194; *State v. Forbes*, 2009 WI App 1, ¶ 18, 315 Wis. 2d 770, 762 N.W.2d 864.

Plaintiffs argue that defendants had no evidence that Todd's behavior had caused any disturbance to public, and that defendants arrested Todd only because he refused to sit down and answer their questions. Plaintiffs argue that it is well-established that police cannot arrest an individual for disorderly conduct simply because the individual was disrespectful to the police or refused to answer the police's questions. *See Braun v. Baldwin*, 346 F.3d 761, 765 (7th Cir. 2003) (person who is "accosted on the street by a policeman who has no reason to suspect him of unlawful behavior" is entitled to "refuse[] to answer the policeman's questions"); *State v. A. S.*, 2001 WI 48, ¶ 16, 243 Wis. 2d 173, 626 N.W.2d 712 (disorderly conduct statute only "proscribes speech that is not constitutionally protected"). In addition, plaintiffs argue that Todd's refusal to answer questions does not support probable cause to arrest for resisting or obstructing an officer. *See Henes v. Morrissey*, 194 Wis. 2d 338, 354, 533 N.W.2d 802, 808 (1995) ("Mere silence, standing alone, is insufficient to constitute obstruction under the statute."). And they argue that because the officers had no lawful authority to seize Todd, the officers had no basis for finding that he resisted or obstructed them.

But plaintiffs' arguments are not persuasive. Plaintiffs have identified no cases in which an officer arresting a person for disorderly conduct or resisting arrest under similar circumstances was held to have violated the Fourth Amendment. All of the cases plaintiffs cite are distinguishable, as none involve facts similar to those in this case. By the time defendants arrested Todd, they had the following information: Todd's daughter had called the police twice, requesting help to control her intoxicated parents; Todd's daughter reported that Todd had been stumbling into the street and might "act up"; Todd was obviously intoxicated; Todd had difficulty communicating and refused to answer questions about the location of his vehicle; Todd had physically resisted officers in a busy, public place; and Todd was being verbally combative. Unlike the arrestees in the cases cited by plaintiffs, Todd did more than remain silent or attempt to get out of a bad situation created by the police. *See, e.g.*, *Rooni v. Biser*, 742 F.3d 737, 741–42 (7th Cir. 2014) (plaintiff had simply attempted to disengage from officer's assault). Todd physically resisted the officers' attempts to keep him safe and stabilize the situation. As discussed above, the officers' attempts to stabilize the scene were not unlawful. Therefore, a reasonable officer in defendants' situation could have reasonably concluded that Todd had done more than be disrespectful and or refuse to answer questions, and that he had engaged in disorderly conduct or resisted an officer. Accordingly, defendants are entitled to qualified immunity for plaintiffs' claims arising out of Todd's arrest by MPD officers.

## B. Todd Cibulka's excessive force claims against UWPD and MPD officers

Plaintiffs contend that defendants Erwin, Johnson, and Rivera used excessive force against Todd when they took him to the ground and handcuffed him. Plaintiffs contend that Erwin used excessive force when he tried to force Todd into a squad car, and that Ellis, Rivera, Martinez, and Gary used excessive force when they lifted him into a transport van and applied

leg restraints on him. An officer's use of force during a seizure is unreasonable if, judging from the totality of the circumstances, the officer uses greater force than was reasonably necessary to effectuate the seizure. *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). In considering the totality of the circumstances, courts must remember that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

In this instance, Todd's excessive force claims against defendants Erwin, Johnson, Ellis, Rivera, Martinez, and Gary are barred by qualified immunity for the many of the reasons that Todd's false arrest claims are barred. The use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and so, police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). Plaintiffs have cited no existing precedent that prohibited defendants from using the amount of force they used with Todd.

The undisputed evidence shows that the individual defendants used the type and amount of force that they thought was reasonably necessary under the circumstances.[1] Defendants Erwin, Johnson, and Rivera brought Todd to the ground and handcuffed him because Todd was actively resisting their attempts to stabilize the situation and to complete their investigation of Emily's calls to the police. Ellis, Rivera, Martinez, and Gary forced Todd into a transport van and applied leg shackles because Todd refused to get into a squad car and

---

[1] Plaintiffs allege that Officer Burgoni choked Todd while attempting to put him in a squad car, but they did not name Burgoni as a defendant, so the court will not consider that allegation in the excessive force analysis.

was kicking at officers. Reasonable officers in defendants' position could have believed that these steps were necessary to protect themselves and Todd from Todd's active resistance, particularly in light of Todd's size and intoxication. Plaintiffs cite no cases in which officers in a similar situation were found to have used excessive force in violation of the Fourth Amendment.

Plaintiffs argue that the officers applied Todd's handcuffs too tightly and that the officers ignored Todd's complaints about his wrists hurting. But plaintiffs have submitted no evidence showing that the officers used the handcuffs in a manner that would injure or harm a typical arrestee. Instead, the evidence shows that the officers used two sets of handcuffs to account for Todd's size. And plaintiffs have not shown that Todd said anything specific to the officers about his pain, beyond stating that his wrists hurt. These facts do not support a claim of excessive force. *See Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009) (generalized complaints about pain from handcuffs, without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that arrestee would be injured by handcuffs). For these reasons, the UWPD and MPD defendants are entitled to summary judgment on Todd's excessive force claims.

## C. Todd Cibulka's claims against Dane County defendants

Plaintiffs have also raised several Fourth Amendment claims based on Todd's experiences at Dane County jail. They contend that Todd was falsely imprisoned because he was not permitted to post bail immediately. They contend that jail deputies used excessive force on him when they forced him into a restraint chair. And they contend that Todd was denied medical care and subjected to inhumane conditions of confinement while he was held in a restraint chair in a segregation cell for nearly two hours.

### 1. False imprisonment

Plaintiffs contend that defendant Katzenmeyer falsely imprisoned Todd at Dane County jail by failing to allow Todd to post bail and leave immediately. Plaintiffs contend that under Wisconsin's Uniform Misdemeanor Bail law, individuals arrested for misdemeanors must be permitted to post bail immediately, regardless whether they complete the jail's standard booking process. Plaintiffs' arguments are not persuasive. First, for purposes of a § 1983 claim, false imprisonment means detention without legal process. *Brown v. Dart*, 876 F.3d 939, 941 (7th Cir. 2017). A finding of probable cause to arrest is an absolute defense to a § 1983 claim for false imprisonment, because the finding of probable cause provides the necessary process. *Lindsey v. Macias*, 907 F.3d 517, 521, n.4 (7th Cir. 2018). In this instance, Dane County jail deputies relied on the probable cause affidavit provided by the MPD officers, and the deputies were justified in booking Todd into the jail. Todd was not falsely imprisoned.

Second, plaintiffs' argument that Katzenmeyer failed to follow Wisconsin's bail law does not support a constitutional claim. The Constitution does not require states to follow their own laws, and a government official's violation of a state procedural rule is not enough to support a constitutional claim. *Lafayette Linear v. Vill. of Univ. Park, Illinois*, 887 F.3d 842, 844 (7th Cir. 2018).

Third, plaintiffs argue that the jail's booking procedures are unconstitutional, because the procedures required Todd to give a breathalyzer test regardless whether police had a warrant or probable cause to believe Todd had committed a crime that would justify the test. But Katzenmeyer did not create the booking procedures. So even if the jail's procedures are unconstitutional, Katzenmeyer would be entitled to qualified immunity for his decision to apply them. Plaintiffs have cited no legal authority suggesting that a reasonable jail deputy in

Katzenmeyer's position would have thought applying the jail's booking procedures was unlawful.

Fourth, plaintiffs have not shown that the jail's booking procedures are unconstitutional. Plaintiffs cite several cases regarding when a police officer may conduct a warrantless breathalyzer test or blood alcohol test in the context of a criminal investigation. *E.g., Schmerber v. California*, 384 U.S. 757, 759 (1966). But these cases not useful here, as they are not relevant to a jail's booking process or the purposes of booking arrestees. The booking process addresses concerns about the safety, security, and medical needs of arrestees, not the investigation of criminal activity. Plaintiffs cite no case in which a court has held that a jail cannot require an arrestee to submit to a breathalyzer test as part of its standard booking and medical clearance procedures.

It is well-established that conditions or restrictions accompanying pretrial detention are constitutionally permissible if they are reasonably related to a legitimate governmental interest. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Dane County jail has an obvious interest in ensuring that individuals brought to the jail do not need immediate medical care. *See Sullivan v. Bornemann*, 384 F.3d 372, 376 (7th Cir. 2004) (explaining that jail had medical clearance procedure because "[w]ithout such a procedure, law enforcement officials risk liability if a medical emergency occurs while the detainee is in their custody"). Todd's level of intoxication was relevant to his medical and mental health condition. Even if Todd had insisted that he could post bail immediately, and there is no evidence that he did insist that, Todd would have been released to an area of the jail with other arrestees and jail staff and would have had to wait to complete paperwork, including photographs, fingerprints, and bail forms. He would then be released to arrange for his own transportation home. It was reasonable for the jail to

assess Todd's medical condition and level of intoxication before releasing Todd to area where he would be with other members of the public, he would not be monitored directly by deputies, and he would be released to potentially drive himself home.

For all of these reasons, plaintiffs have not shown that Todd was falsely imprisoned when defendant Katzenmeyer failed to allow him to post bail and be released before completing the jail's standard booking process.

### 2. Excessive force

Plaintiffs contend that Dane County jail deputies Katzenmeyer, Deibele, Mark Anderson, and Brandi Anderson used excessive force on Todd when they forced him into a restraint chair in the booking area at the jail. But the evidence does not support plaintiffs' arguments. As discussed above, Katzenmeyer and Dane County had legitimate reasons for requiring Todd to provide medical information and a breathalyzer test before he could complete the booking process. Because Todd refused to cooperate, Katzenmeyer had to decide what to do with him. Katzenmeyer followed jail policies by deciding to hold Todd in a segregation cell until he agreed to cooperate.

Katzenmeyer's decision makes sense. Todd was intoxicated and had been arrested after a confrontation with law enforcement, so leaving him unattended in the booking area was not an option. And jail staff could not be expected to monitor him in the booking area until he agreed to cooperate. Because Todd refused to answer medical questions, Katzenmeyer did not know whether any medical or medication protocols or precautions should be initiated. Holding Todd in segregation would ensure that Todd was checked on frequently and would give Todd time to reconsider his refusal to cooperate.

Todd complains about the amount of force used to place him in the restraint chair, and he alleges that Katzenmeyer's reliance on compliance holds and pressure points caused him to lose consciousness. But again, the evidence does not support Todd's claim. Katzenmeyer resorted to the restraint chair only because Todd refused orders to cooperate, stand up, and walk out of the booking area to a segregation cell. If Todd had complied with orders to walk to the segregation cell, a restraint chair would not have been necessary. The deputies had to use force to put Todd in the restraint chair because Todd physically resisted being moved to the chair. It is undisputed that Todd attempted to hold his body in the booking room chair, and that he engaged in a physical struggle with the deputies by tensing and twisting his body, moving his arms, and thrusting his hips away from the restraint chair. In light of Todd's size, strength, and physical resistance, the deputies' use of force to place Todd in the restraint chair was reasonable.

Todd has submitted no evidence to support his argument that Katzenmeyer's use of a compression hold on Todd's head was excessive and caused Todd to lose consciousness. He has submitted no medical expert testimony to support his allegation that he lost consciousness at any point while at Dane County jail. Nor has Todd submitted medical expert testimony stating that Katzenmeyer's actions could have caused him to lose consciousness. Even if Todd had lost consciousness, it could have been caused by his own intoxicated state or by the fact that he had exerted significant energy when he struggled against nine law enforcement officers.

In some situations, a person might be able to testify from their own personal experience about losing consciousness. But Todd's deposition testimony is too vague and confusing to support a finding that he lost consciousness at any point. He testified at his deposition that he does not know when he lost consciousness, but that he thinks he went in and out of

consciousness for 10 to 15 minutes during and after the time deputies were strapping him into the chair. Dkt. 46, at 218. When asked to explain what he meant by "losing consciousness," Todd stated that being unconscious meant being awake, and perhaps looking around, but being "dazed and confused" and "neurologically" unconscious. *Id.* at 215–16, 218, 225. He then admitted he has no medical expertise in neurology.

The video footage from the booking area contradicts Todd's testimony that he lost consciousness. *See Scott*, 550 U.S. at 380; *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge in stories clearly contradicted by the footage."). The footage shows that Todd was conscious and moving while he was being secured in the restraint chair, and that Todd was moving his head and speaking after he was placed in the restraint chair, including while he was being evaluated by a nurse in the booking room and while he was being taken to the segregation cell.

Finally, even the deputies' use of force was excessive, the deputies are entitled to qualified immunity. Plaintiffs have failed to identify any legal precedent that would have prohibited the deputies from using force to put an uncooperative arrestee into a restraint chair under the circumstances of this case. Accordingly, the Dane County defendants are entitled to summary judgment on Todd's excessive force claim.

### 3. Inhumane conditions of confinement and denial of medical care

Plaintiffs contend that Todd was denied medical care and subjected to harsh and inhumane conditions of confinement while he was held at the jail. But plaintiffs have not submitted evidence sufficient to sustain these claims.

As for medical care, plaintiffs contend that Todd should have been given medical treatment for the injuries caused by his restraints and loss of consciousness. But Todd has not submitted evidence showing that he was injured by the restraints or that he lost consciousness. And even if he had, Todd has not shown that any of the named defendants were aware that Todd needed medical treatment for any injuries or medical conditions. Todd never reported any medical needs and never requested medical attention from defendants, and he did not have any obvious injuries. Video footage from the jail shows that Todd was conscious and moving his head after he was secured in the restraint chair, while he was being evaluated by a nurse, and when he was transported to the segregation cell. The deputies were justified in relying on the opinion of the jail nurse that Todd's restraints were properly and safely secured and that there were no obvious medical concerns. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (correctional staff who are not medically trained may rely on the judgment of medical professionals).

Todd also did not report any injuries or request medical care from mental health staff when they spoke with him on three separate occasions while he was in the restraint chair. Nor did he report any injuries or request any medical attention from the nurse who assessed him after he was removed from the restraint chair. In sum, Todd was offered medical and mental health care multiple times during his five-hour detention, but he declined care. Under these circumstances, defendants cannot be liable for failing to provide medical care to Todd.

As for Todd's claim that he was housed in inhumane conditions of confinement, Todd says that he was held in the restraint chair for nearly two hours without being monitored adequately. Todd has submitted no evidence to suggest that he was not monitored adequately or that he had to sit in soiled clothing. And it is undisputed that Todd never asked anyone if

he could use the restroom or if he could have clean clothes. It is also undisputed that the none of the individual defendants were aware that Todd had soiled himself, and Todd was provided with a clean jail uniform after he was removed from his chair. In short, the evidence does not support Todd's claims that he was denied medical care or subjected to inhumane conditions of confinement. And even if holding Todd in a restraint chair for two hours could be considered inhumane, defendants would be entitled to qualified immunity on that claim. Todd was placed in a restraint chair because of his own actions, and plaintiffs have cited no case law establishing that it was unconstitutional for defendants to restrain him until he calmed down and agreed to comply with jail procedures.

### D. Shelly Cibulka's abuse of process claim

Shelly Cibulka's sole claim is that defendant Rivera subjected her to abuse of process by taking her into protective custody and confining her at a detoxication facility without her consent or adequate justification. Rivera has raised several arguments as to why this claim fails, but the court need not address them all because this claim is clearly meritless.

To succeed on an abuse of process claim, Shelly would need to show that Rivera used a legal process for an improper purpose. *See Schmit v. Klumpyan*, 2003 WI App 107, ¶ 7, 264 Wis. 2d 414, 663 N.W.2d 331. Shelly contends that Rivera misused Wisconsin's process for taking protective custody for incapacitated persons, Wis. Stat. § 51.45(11). But most of plaintiffs' arguments address whether she met the statutory definition of a person "incapacitated by alcohol." This question does not implicate the Constitution. Whether Rivera interpreted the state statute more broadly than plaintiffs think is proper is not a matter of constitutional law that would that would support an abuse of process claim. Shelly must show that Rivera used the statute for an improper purpose.

Shelly argues that Rivera took her into protective custody to humiliate and harass her. But she has submitted no evidence to support this assertion. The evidence shows that Shelly was intoxicated and did not know where her vehicle was, that her daughter had been unable to control her, and that her husband had been arrested. The only reasonable conclusion from the evidence is that Rivera acted out of legitimate concern for Shelly's safety and well-being. There is no evidence that Rivera intended to harm Shelly, humiliate her, or detain her for any improper reason. Therefore, Shelly's abuse of process claim fails. Rivera is entitled to summary judgment on this claim.

## E. *Monell* claims against City of Madison and Dane County Sheriff's Office

Finally, defendants move for summary judgment on plaintiffs' claims that the City of Madison and Dane County Sheriff's Office are liable for the officers' violation of plaintiffs' constitutional rights. To succeed on such a claim, plaintiffs must prove that the officers' unconstitutional actions were caused by (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978)). In this instance, plaintiffs argue that the city failed to provide officers adequate training concerning intoxicated individuals, de-escalation techniques, and use of force, and that the county failed to provide adequate training regarding use of force, provision of medical care, and humane conditions of confinement.

Plaintiffs' claims are governed by a deliberate indifference standard. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the

rights of persons with whom the police come into contact."); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."). Proof of deliberate indifference requires more than negligence. *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 407 (1997). A plaintiff may make this showing several ways, including by showing that: (1) the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights; and (2) a repeated pattern of constitutional violations makes the need for further training obvious. *City of Canton*, 489 U.S. at 390 and n.10.

For those claims for which plaintiffs have failed to establish any constitutional violation, their *Monell* claims automatically fail. *See Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 470 (7th Cir. 2016) (claim against municipality fails if there is no underlying constitutional violation). Plaintiffs could theoretically succeed on a *Monell* claim for the claims for which defendants are entitled to qualified immunity, but plaintiffs have submitted no evidence of a deficiency in the city's or county's policies or training that could give rise to a claim for deliberate indifference. It is undisputed that all the city and county defendants received training on relevant procedures, and plaintiffs have identified no deficiencies in their specific training that would support their claims. Plaintiffs suggest vaguely that because defendants violated plaintiffs' rights, there is a dispute about whether their training or discipline was sufficient. But to survive summary judgment, plaintiffs must do more than make unsupported assertions. *See Driveline*

*Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 580 (7th Cir. 2019). Accordingly, plaintiffs' *Monell*

claims fail.


## ORDER

IT IS ORDERED that:

1. Plaintiffs Todd Cibulka and Shelly Cibulka's motion for summary judgment, Dkt. 68, is DENIED.

2. The motions for summary judgment filed by defendants Barrett Erwin, Corey Johnson, and Jeffrey Ellis, Dkt. 47; Nathan Katzenmeyer, Mark Anderson, Brandi Anderson, Luke Deibele, and Dane County Sheriff's Office, Dkt. 55, and Hector Rivera, Jose Martinez, Hannah Boulden, Trent Scanlon, Jamar Gary, and City of Madison city defendants, Dkt. 60, are GRANTED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered March 23, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge